CHRISTINA ADAMS *et al.*

*v.*

KAJSA GRETA AKERLUND *et al.*

Opinion filed November 8, 1897.

1. TREATIES—*State enactments conflicting with existing international treaties must give way.* Provisions of State enactments which conflict with the provisions of existing international treaties must give way to the latter.

2. SAME—*when treaty admits of two constructions the most liberal is preferred.* In construing treaties courts will adopt the same general rules of construction as are applicable to statutes, contracts or other written instruments; and where a treaty admits of two constructions, one restricted as to the rights claimed thereunder and the other liberal, the latter is preferred.

3. SAME—*construction of article 6 of treaty between United States and Sweden.* Article 6 of the treaty of 1783 between the United States and Sweden, continued in force by the later treaty of 1827, which provides that the subjects of the two nations may dispose of their *"fonds et biens"* (translated "goods and effects") by testament, donation or otherwise, and that their "heirs" shall receive the succession "even *ab intestato*," covers real estate as well as personal property.

4. ALIENS—*subjects of Sweden may hold real estate in Illinois.* Even prior to the repeal of the Alien act of 1887 (Laws of 1887, p. 5,) by the act of 1897, (Laws of 1897, p. 5,) non-resident alien subjects of the kingdom of Sweden might, by virtue of the treaty between the United States and Sweden, take and hold real estate in Illinois by descent or otherwise, the provisions of the act of 1887 to the contrary notwithstanding.

APPEAL from the Superior Court of Cook county; the Hon. JOHN BARTON PAYNE, Judge, presiding.

This is a bill for partition, brought by Kajsa Greta Akerlund against Baba Brita Norlander and Hans Norlander, her husband, and Christina Adams and Henry W. Adams, her husband. The property sought to be divided is a certain house and lot in Cook county. The bill alleges, that the complainant, and the defendant, Baba Brita Norlander, were each the owner of an undivided one-half of said premises; and that the defendant, Christina Adams, has no interest therein, but is in the posses-

sion thereof, and unlawfully holding such possession. The bill was answered by Christina Adams and her husband, and by Baba Brita Norlander and her husband. The court below entered a decree, finding that the complainant and Baba Brita Norlander were the owners each of an undivided one-half of the premises by descent from their deceased brother, as hereinafter stated; and that the defendants, Christina Adams and Henry W. Adams, had no interest in the said premises, and held possession thereof unlawfully. Commissioners were appointed to divide the premises, who reported that the same were not susceptible of division. In their report they fixed the value of the premises at $2400.00. Thereupon, the court entered the usual decree in partition for the sale of the premises. The present appeal is prosecuted from such decree of sale.

John Wilson, a brother of the complainant, Kajsa Greta Akerlund, and of the defendant, Baba Brita Norlander, died intestate on May 18, 1894, leaving no widow, nor children, nor descendants of children, nor any parents living, but leaving, as his two heirs-at-law, his two sisters, the complainant, and the defendant, Baba Brita Norlander. At the time of his death said Wilson was a citizen of the United States, but at that time his two sisters above named were, and ever since have been, and are now, residents and subjects of the kingdom of Sweden. The defendant, Christina Adams, is a daughter of the complainant below and a citizen of the United States.

HAMILTON & STEVENSON, for appellants.

H. H. C. MILLER, and W. S. OPPENHEIM, for appellees.

Mr. JUSTICE MAGRUDER delivered the opinion of the court:

The appellee, Kajsa Greta Akerlund, and her sister, Baba Brita Norlander, were, at the time of the death of their brother, and ever since have been, and are now,

residents and subjects of the kingdom of Sweden. They are, therefore, non-resident aliens. Under the act of the legislature of Illinois of July 1, 1887, in regard to aliens (Laws of Illinois of 1887, p. 5), they cannot inherit said premises, as heirs of their brother, if there is no treaty between the United States and Sweden permitting them to do so. In *Wunderle* v. *Wunderle,* 144 Ill. 40, we held that non-resident aliens, under the act of 1887, are not capable of acquiring title to, or taking or holding, any land or real estate by descent, unless there is some treaty between the government, of which they are subjects or citizens, and the government of the United States, permitting them to do so. The act of 1887 must give way, if it conflicts with any existing treaty between the United States and the kingdom of Sweden. The disqualification, imposed by the act of 1887, is removed wherever there is a treaty, conferring the right to take or hold or transfer real estate. Therefore, the question to be considered in this case is, whether there is any treaty between the United States and Sweden, under which the sisters of the deceased Wilson are authorized to inherit said premises as his heirs.

On April 3, 1783, a treaty of amity and commerce was negotiated between the United States, represented by Benjamin Franklin, and the king of Sweden represented by Gustav Philip, Comte de Creuts. This treaty was terminated, by the limitation contained in the first separate article thereof, fifteen years from the day of its ratification; but, on July 4, 1827, another treaty was negotiated between the king of Sweden and Norway and the United States. By article 17 of the treaty of 1827, certain articles of the previous treaty of 1783, including article 6 of the latter treaty, were revived and made to have the same force and value, as if they had been inserted in the context of the treaty of 1827. These treaties are published in volume 8 of the United States Statutes at Large in both the French and English lan-

guages. (8 U. S. Stat. at Large, pp. 60, 346). Whether the original treaty of 1783 was written in the French language alone, or whether the English and French copies thereof as so published were both original treaties, does not appear from this record. Both parties to this litigation refer to the treaty, as set forth in volume 8 of the United States Statutes at Large, and in that volume it is printed in both languages.

Article 6 of the treaty of 1783, as revived by the treaty of 1827, contains the following words: "The subjects of the contracting parties in the respective States, may freely dispose of their goods and effects either by testament, donation or otherwise, in favor of such persons as they think proper; and their heirs in whatever place they shall reside, shall receive the succession even *ab intestato*, either in person or by their attorney, without having occasion to take out letters of naturalization. These inheritances, as well as the capitals and effects, which the subjects of the two parties, in changing their dwelling, shall be desirous of removing from the place of their abode, shall be exempted from all duty called '*droit de detraction*,' on the part of the government of the two States respectively." The French words appearing in the French copies of the treaty, which correspond to the words, "goods and effects," are "*fonds et biens.*"

Appellees claim, that the French word, "*biens*," means real, as well as personal property. They introduced a witness upon the stand, who was a native of France and educated in that country, to prove, that such was the meaning of the word. This testimony, if it was not actually improper, was not material. (*United States* v. *Turner*, 11 How. 663).

Bouvier, in his Law Dictionary, defines the French word, "*biens*," to mean: "Property of every description, except estates of freehold and inheritance." But this is evidently the strict meaning, which it has, as it is defined by the common law writers; because, immediately after

this definition, he adds these words: "In the French law this term includes all kinds of property real and personal. *Biens* are divided into *biens meubles*, movable property, and *biens immeubles*, immovable property." It would thus appear, that the word, as used in the original treaty in the French language, has a meaning in the civil law, which includes both real and personal property. In a note to section 13 of Story on Conflict of Laws (8th ed.) it is said: "The term '*biens*,' in the sense of civilians and continental jurists, comprehends not merely goods and chattels, as in the common law, but real estate." It is also said in a note to section 146 of the same work: "Foreign jurists commonly in the term *biens* include all sorts of property, movable and immovable, in their discussions on this subject."

If, therefore, we look to the treaty, as published in the French language, the term there used includes real estate, as well as personal property. Counsel for appellants contend, that the French expression, "*fonds et biens*," is correctly translated as "*goods and effects*." It is insisted, that the English copy of the treaty, whether the treaty was originally negotiated in English as well as French, or whether an English translation was made of it after its original negotiation, is an official promulgation of the treaty in the English language, in view of the fact that it appears in publications and editions of the United States Statutes at Large as authorized by Congress. Whether this view is correct or not, it may be admitted for the purposes of this case, that the words, "*goods and effects*," are a correct translation of the French expression, "*fonds et biens*." The question then arises as to the meaning of the word, "effects."

It cannot be doubted, that, in certain connections, the word, "*effects*," sometimes refers to both real and personal property. It is true, that, as a general thing, the word, "*effects*," when used in connection with the word "goods," means personal property, and not real property. But this

is not its correct meaning, where a contrary intention appears from the terms of the instrument in which the word occurs. The word, *"effects,"* is "a very general term used to denote whatever a man has that can effect, produce or bring forth money by sale." (6 Am. & Eng. Ency. of Law, p. 174). Bouvier defines the word *"effects,"* as follows: "Property or worldly substance. As thus used, it denotes property in a more extensive sense than goods. (2 Black. Com. 284). Indeed the word may be used to embrace every kind of property, real and personal, including things in action."

If the expression here, instead of being *"goods and effects,"* was "goods and *other* effects," we should be inclined to apply the rule of construction, that general and specific words, which are capable of an analogous meaning, being associated together, take color from each other, so that the general words are restricted to a sense analogous to the less general. (*Misch* v. *Russell*, 136 Ill. 22; *First Nat. Bank of Joliet* v. *Adam*, 138 id. 483). Thus, in the case of *First Nat. Bank of Joliet* v. *Adam, supra,* where the words used were, "all goods, chattels or *other* property," it was held, that the general words, "or *other* property," would be restricted to a meaning analogous to the meaning of the words, "goods and chattels," and consequently would not embrace such property as fixtures or chattels real, partaking more of the nature of realty than personalty. So, here, if the expression were, "goods and *other* effects," the words, *"other* effects," would be restricted to a meaning analogous to the meaning of the word, "goods," and would not embrace real property. But, as the word, "other," is not used, there is no occasion for the application of the maxim, *ejusdem generis.* Even, however, if this maxim were applicable to the expression, *"goods and effects,"* if it stood alone, yet it is not applicable to the word, "effects," as here used, when considered in connection with other expressions appearing in article 6 as above quoted. In interpreting wills, it is well settled, that the word,

"effects," will be construed as including land, where it can be collected from other parts of the will, that such was the testator's intention.    In other words, where the context of a will shows, that it was the intention of the testator to dispose of his realty, the courts have held, that the word "*effects*" is sufficient to include the real estate. (6 Am. & Eng. Ency. of Law, pp. 176, 177; *Smyth* v. *Smyth,* 8 L. R. Ch. Div. 561; *Page* v. *Foust,* 89 N. C. 447).    This being a proper rule of construction in the case of wills, it is equally proper as applied to public treaties.

Where treaties concern the rights of individuals, it is frequently necessary for the courts to ascertain by construction the meaning intended to be conveyed by the terms used.    (*United States* v. *Rauscher,* 119 U. S. 407; *Wilson* v. *Wall,* 6 Wall. 83; *Head Money cases,* 112 U. S. 580).    In thus giving a construction to the language of treaties, the courts will adopt the same general rules, which are applicable in the construction of statutes, contracts and written instruments generally, in order to effectuate the purpose and intention of the makers.    (26 Am. & Eng. Ency. of Law, p. 555).    Moreover, it is another well settled rule, laid down by the Supreme Court of the United States, that, "where a treaty admits of two constructions, one restricted as to the rights that may be claimed under it, and the other liberal, the latter is to be preferred." (*Hauenstein* v. *Lynham,* 100 U. S. 483; *Schultze* v. *Schultze,* 144 Ill. 290).

When, therefore, we consider the meaning of the words, "*goods and effects,*" in connection with the rest of article 6 as above quoted, we find such expressions therein as the following: "Their heirs, in whatever place they shall reside, shall receive the succession even *ab intestato,*" etc.; and: "These inheritances * * * shall be exempted from all duty," etc.    The words, "heirs," "succession," and "inheritances," as here used, are very significant words in determining the meaning to be given to the word "effects."    An heir is "one who upon the death of another

acquires or succeeds to his estate by right of blood and by operation of law; the person who takes an estate of lands or tenements by descent from another. * * * In the Roman law and in the modern civil law, *haeres* or *heir* has a more extended significance than in the common law. The term is applied to all persons entitled to succeed to the estate of one deceased, whether by act of the party or by operation of law, and whether the property be real or personal in its nature." (9 Am. & Eng. Ency. of Law, 357). At common law chattels did not descend by inheritance, except in the instances in which they came under the description of heirlooms. Bouvier defines the term, *"inheritance,"* as follows: "A perpetuity in lands to a man and his heirs; the right to succeed to the estate of a person who dies intestate. The term is applied to lands. The property which is inherited is called an inheritance. The term, 'inheritance,' includes not only lands and tenements which have been acquired by descent; but every fee simple or fee tail which a person has acquired by purchase, may be said to be an inheritance, because the purchaser's heirs may inherit it." He also says, that, in the civil law, the term means "the succession to all the rights of the deceased. It is of two kinds: that which arises by testament, when the testator gives his property to a particular person; and that which arises by operation of law, which is called succession *ab intestato.*" Inheritance has also been defined to be, "an estate which descends or may descend to the heir upon the death of the ancestor. Estates of freehold are estates of inheritance absolute or limited." (2 Blackstone's Com. 104, 120; 10 Am. & Eng. Ency. of Law, p. 777). The word *"inheritance,"* in its usual legal acceptation, applies to lands descended. In its popular acceptation, it includes all the methods by which a child or relation takes property from another at his death, except by devise, and includes as well succession as descent. (*Horner* v. *Webster,* 33 N. J. L. 413). "Succession," in the civil law, denotes the trans-

mission of the rights and obligations of a deceased person to his heir or heirs. The word "succession" is often used synonymously with the word, "descent." Descent is hereditary succession to an estate in realty. "Descent" usually applies to the devolution of real estate. The word, "*inheritance*," is also often used synonymously with "descent," and refers ·to the devolution of real property. In its popular acceptation, however, the word, "inheritance," includes the devolution of both real and personal property, and is co-extensive in meaning with the word "*succession*." (24 Am. & Eng. Ency. of Law, p. 345). Succession in the civil law includes immovable as well as movable estates.

Thus in article 6 of the treaty we find the words "*heirs*" and "*inheritances*" used. These words in their strict common law signification refer only to the descent or devolution of real property; but in their broader signification they include both real and personal property. We also find the word, "*succession*," used, which refers as well to the descent of real as of personal property. It is evident, therefore, that the terms of the treaty were intended to include real estate as well as personalty, and that the word, "*effects*," was intended to have the broader meaning which includes both land and personalty. The view thus taken is sustained by the case of *University* v. *Miller*, 3 Dev. (N. C.) 188, where article 6 of a treaty made in 1782 with the States General of the United Netherlands, and which may be found in volume 8 of United States Statutes at Large, on page 36, containing similar language to that in article 6 here under consideration, was construed by the Supreme Court of North Carolina in the· following words: "The next question is the· effect of that treaty on the case. By the sixth article it is provided, that the subjects of either party may dispose of their *effects* by testament, donation or otherwise; and their *heirs*, subjects of one of the parties, shall receive such successions *ab intestato*, even though they have not received letters of

naturalization. And if the *heirs* to whom such succession falls shall be minors, their guardian or curator may govern, direct and alienate the *effects* fallen to such minors by *inheritance*. If this case rested on the meaning to be given to the word *effects*, even without a context, I should think, being found where it is, in a treaty between powers having no common technical terms, in fact not a common language, that it included things immovable as well as movable. In the first place, the instrument is to receive an extended and liberal construction; not like the contract of individuals, where nothing is presumed to be granted, but what falls plainly within the words of the grant. But in this case, unless the meaning of the word be extended to things immovable, nothing at all is granted by the word *effects*. For by our law, alienage is no objection to the acquisition of movables in any way, either by purchase, or succession *ab intestato*. And so I presume it is in the States General. If not, to obtain it by pretending to grant something in lieu of it, when in fact nothing was granted, is a trick which I would not, even in argument, impute to our negotiator. But taken with the context, I think there cannot be a doubt. The words *succession ab intestato* are a well known term of the civil law; a law, on which the laws of continental Europe may be said to be based. By that law, it includes succession to immovable as well as movable estates. And to use terms, which by this almost universal law, would give to our citizens the right to succeed to immovable estates, and to deny it to them by any restricted sense, to which we might confine the terms, is not presumed to have been the intent of either party. I say, to give to our citizens, because if the civil law prevails in the Netherlands, and I presume it does, it would do so. But why negotiate in the terms of the laws of the Netherlands, and not in the terms of our laws? The answer is, our laws are peculiar to us and the English; the civil law, common to all continental Europe. But there are terms in the context,

168—41

which even in our law would give to this word *effects* an immovable character. In the civil law, he who succeeds to the estate of a dead man, either movable or immovable, is called *heir*. By our law, the term is confined to him who succeeds to his immovable, or rather real estate. By the civil law, *inheritances* embrace movable as well as immovable estates. By our law, the term is confined to immovable estates; at least, it does not embrace what we call chattels. But in the treaty, both the word *heirs* and the word *inheritances* are used. How shall they be understood; according to our laws or theirs? If by our laws, goods only are to be included, we shall have in our legal phraseology, new to be sure, *heirs claiming money and other personal goods, descending from their ancestor as their inheritance.* It is very plain, I think, that it was intended to embrace all kinds of property by the treaty; and, therefore, the lands in question are embraced by it. Effects descending by inheritance must include land." We are of the opinion, that article 6 of the treaty with Sweden, construed liberally and in accordance with the usual rules of construction applicable to statutes, contracts and other instruments in writing, includes land as well as personal property. It follows, that the Illinois statute of 1887 above referred to must give way as conflicting with article 6 of the treaty. The appellee, Akerlund, and her sister, Norlander, were the only surviving heirs of their deceased brother, Wilson; and consequently the Superior Court decided correctly in holding that they were each entitled to one undivided half of the premises in question.

The decree of the Superior Court of Cook county is affirmed.

*Decree affirmed.*