ELI A. GAGE *et al.*

*v.*

WILLIAM A. CAMERON.

*Opinion filed October 24, 1904.*

1. CONSTRUCTION—*rule of ejusdem generis not applied if larger intent is clear.* The rule of *ejusdem generis* will not be applied where, from the whole instrument, a larger intent may be gathered which will be defeated by the application of the rule.

2. SAME—*rule of ejusdem generis should not be applied to deprive words of all meaning.* The restriction of general words of a deed to things *ejusdem generis* must not be carried to the extent of depriving the general words of all meaning, as where the particular enumeration is so exhaustive as to leave nothing which can be termed *ejusdem generis.*

3. DEEDS—*when rule of ejusdem generis will not be applied to assumption clause.* The words "and claims of any and every description," used in the assumption clause of a warranty deed made subject to "existing mortgages, liens, taxes and claims of any and every description, which the party of the second part assumes and agrees to pay," are not to be restricted to claims shown of record to be encumbrances upon the property.

4. SAME—*parol evidence competent to identify claims assumed.* If the identity of the mortgages, liens, taxes and claims, of any and every description, assumed by the grantee are left in doubt by the terms of the deed, parol evidence is admissible to show what claims were embraced in the language used, since it is presumed they were assumed as part of the consideration.

5. SAME—*effect where deed assuming encumbrances is made to trustee.* If the grantee who assumes existing encumbrances holds title for the benefit of another who paid the consideration, the beneficiary, in case of a deficiency, is liable therefor, and he cannot relieve himself from such liability by any language put in the deed made to him by the grantee, who held title for his benefit.

6. SAME—*the acceptance of deed with knowledge of assumption clause binds grantee.* Although a grantee does not sign a deed to him containing a clause assuming encumbrances, yet if he accepts the deed and places it upon record with knowledge of its contents he is bound as effectually as though he had executed the deed.

7. SAME—*charge upon land may be created by contract.* A clause in a deed whereby the grantee assumes and agrees to pay "existing mortgages, liens, taxes and claims of any and every description," creates a charge upon the land conveyed, which covers

accepted orders in favor of persons having claims for labor or material furnished for the erection of a building on the land.

8. EQUITY—*right of mortgagor to enforce assumption agreement.* If the purchaser of mortgaged property assumes the payment of the mortgage debt, the mortgagor may proceed in equity to compel the purchaser, to whom the mortgagor stands in the relation of a surety, to discharge the debt for his protection.

9. SAME—*right of intervenor cannot be defeated by dismissal of suit.* An intervenor has the right to claim the benefit of the original suit and prosecute it to judgment, and such right cannot be defeated by dismissal after notice of the filing of the intervening petition.

APPEAL from the Branch Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. R. S. TUTHILL, Judge, presiding.

This is an appeal from a judgment of the Appellate Court, reversing a decree of the circuit court, rendered in favor of the appellants, without remanding the cause.

The original bill was filed on September 13, 1901, by Eli A. Gage, appellant, as complainant, against the appellee, William A. Cameron, and John McSorley, and G. H. Detlor, as defendants; and, after setting up an arrangement between complainant and McSorley for the erection of a large flat-building upon sub-lots 6 to 9, both inclusive, of Sidney Kent's subdivision, etc., in Chicago, Cook county, by the terms of which complainant was to hold the legal title to said property, the bill alleged that Anna Connell, and her husband, by warranty deed, conveyed said premises to complainant, which warranty deed was dated October 21, 1899, and recorded November 23, 1900; that by warranty deed, dated October 11, 1900, and recorded November 23, 1900, the complainant, Gage, conveyed said lots to Detlor, and that subsequently by deed, dated December 27, 1900, recorded February 27, 1901, Detlor conveyed said lots with the improvements thereon to appellee, Cameron; and the bill prayed that Cameron might be declared to hold said property in trust for the benefit of complainant, Gage, and such persons and

corporations, as furnished labor and material for the construction of said building, for which they had not been paid; and that the deeds from complainant to Detlor, and from Detlor to Cameron, should be declared null and void, and set aside; that Cameron be enjoined from transferring, and that a receiver be appointed, and for general relief. Answers were filed to the original bill by Cameron and Detlor. On December 10, 1901, William A. Cameron, one of the defendants, filed a cross-bill, praying that a certain contract or indemnity mortgage, executed by John McSorley and his wife to the complainant, Gage, dated November 26, 1900, and recorded March 13, 1901, might be set aside as a cloud upon Cameron's title, and delivered up to be canceled. This cross-bill was answered by Gage, the complainant below, who set up the execution and delivery by him to Detlor, or Cameron, of the deed, dated October 11, 1900, together with an assumption clause therein, and alleged that, although said deed recited the consideration of $1000.00, yet no sum of $1000.00, or any sum, was paid by him, and that the real consideration of said deed of October 11, 1900, was that a loan might be made on said property with which to pay the indebtedness incurred by John McSorley or the Central Brick and Stone Company, and obligations, incurred by Gage in connection with the building upon said premises, and to pay certain orders, which had been accepted by Gage, payable personally, or out of the loan to be made upon the property; and the further agreement in said deed contained being the assumption clause above referred to, and hereinafter quoted. The answer of Gage to the cross-bill also mentions many of the claims, whose payment was assumed by said deed, and also states that the instrument, sought to be removed as a cloud, was made and delivered by McSorley to Gage before the deed from the latter to Detlor was delivered, and was one of the mortgages assumed in that deed, and admits that McSorley had an equitable interest in the profits of said property, but denies that Cameron purchased that interest for a

good and valuable consideration. The answer further stated that Cameron took the title to the property subject to the mortgages, liens, taxes and claims of every description, and agreed to pay the same, but refused to do so.

On December 30, 1901, Gage filed an amended bill, in which after referring to the execution of the deed by Anna Connell and husband to Gage on October 21, 1899, under the arrangement above referred to, it was alleged that McSorley caused contracts to be made by the Central Brick and Stone Company, a corporation of which McSorley was president, for the purpose of erecting said building, and thereby large indebtedness was incurred in that connection; that McSorley for himself and said company agreed with Gage that a loan should be placed on said property as soon as the building should be under roof, out of the proceeds of which the indebtedness so incurred, and the obligations incurred by Gage by reason of certain orders accepted by him, and also certain claims against McSorley individually, as well as the cost of building the building, should be paid; that Gage, who was to hold the title during the erection of said building, accepted certain orders drawn on him in connection with erecting the same, payable out of said loan, and agreed that certain other matters should be paid out of the money to be so raised; that Gage attempted to make such loan, sufficient for said purposes, but was unable to do so; that Cameron had furnished material for use in said building, for which McSorley, or the Central Brick and Stone Company, had become indebted; that, thereupon, it was agreed between Gage, McSorley, Cameron and Detlor, the latter being in the employ of Cameron, that Gage should transfer the property to Detlor, and in consideration thereof a loan should be made upon the property in a sum sufficient to pay all of the indebtedness remaining unpaid, and whatever would be necessary to complete the building; that the grantee in said deed of October 11, 1900, should assume and agree to pay existing mortgages, liens, taxes and claims of any and every descrip-

tion, and should hold the title for said purpose, and for the benefit of Gage, McSorley and Cameron; that, relying upon said agreement, complainant by said warranty deed of October 11, 1900, conveyed the property to Detlor; that said deed, which is the usual short form of a warranty deed, makes the following recitation, after the description of the property conveyed, to-wit: "Subject, however, to existing mortgages, liens, taxes and claims of any and every description, which the party of the second part assumes and agrees to pay;" that said deed was acknowledged on October 17, 1900, but not recorded until November 23, 1900; that the real consideration of said deed was as above stated, no sum of money having been paid to Gage for said transfer; that said deed of October 11, 1900, was accepted by Detlor for Cameron, and therefore accepted by Cameron, and that Cameron and Detlor thereby jointly and severally agreed to pay said mortgages, liens, taxes and claims of every description, and said property thereby became charged therewith; that, by the deed dated December 27, 1900, Detlor conveyed the property to Cameron, who became possessed thereof, charged with and subject to said mortgages, liens, taxes and claims; that, as Gage had incurred, on behalf of McSorley and the Central Brick and Stone Company, indebtedness in connection with said building, McSorley agreed to save him harmless, and for that purpose made the indemnity mortgage above referred to, which was made and delivered before the delivery of the deed from Gage to Detlor, and is one of the claims assumed by the grantee in said deed; that at that time McSorley had an interest in the profits that might arise from the sale of said lots and in the property itself; that McSorley claimed that said indemnity contract should not be recorded as it might interfere with the proposed loan, and Gage, relying upon the agreement of the parties, did not record the same; that no loan was made while Detlor held the title, and none of said indebtedness, or claims, was paid by any of the defendants; that McSorley and Cameron con-

spired together to defraud Gage, and those who had furnished labor and materials for the said building, and other creditors and claimants, and fraudulently agreed that Cameron should purchase McSorley's interest in the property, and in any contracts he might have in regard to the same, for $5000.00 in money or notes; that said property should be transferred to Cameron, and that none of the liens or claims thereafter in the bill referred to should be paid, and that none of the indebtedness already incurred in erecting the building should be paid, except so far as it was specifically recorded or a mechanic's lien upon the property, and that Cameron should take the property subject only to such recorded encumbrances and liens, and should complete the building and become the owner of it, which was of great value, for a grossly inadequate consideration; that Cameron now claims to be a *bona fide* purchaser of the property, and to own the same in fee, free from the liens and claims set forth in the bill, and refuses to recognize and pay the same; that his acquisition of the property was in fraud of the rights of Gage, and the claimants, and that the purchase price, alleged to have been paid by Cameron, was inadequate, and was $25,000.00 less than the actual value of the property; that the conveyance of the property by Detlor to Cameron on December 27, 1900, which was in pursuance of an agreement between McSorley and Cameron, was made without Gage's knowledge, and that Cameron took a transfer of all McSorley's interest in the property and in the rents and profits thereof; that Cameron paid McSorley a small sum of money and gave notes either of himself or of the corporation above referred to; that some of said notes have not been paid and should be paid to Gage on his indemnity mortgage.

The amended bill then sets up certain claims, the payment of which is alleged to have been assumed by the grantee in the deed of October 11, 1900; that certain of the claimants have commenced suit against Gage on said claims and recovered judgment; that Cameron and Detlor refuse to pay

the claims in question, and that Detlor is without means, and is unable to pay the same; that Gage, the complainant, brings this suit in his own behalf and in behalf of any other claimants referred to, who desire to join therein. The amended bill makes McSorley, Cameron and Detlor defendants, and requires them to set forth all the facts and circumstances regarding the conveyances from Gage to Detlor, and from Detlor to Cameron, and from McSorley to Cameron, and the amount of money paid by Cameron to McSorley, and the amount of money paid out by Cameron on account of said buildings, and the amount of rents received by him; that McSorley may set forth a full list of the claims; that Cameron be declared to hold the property in trust for the benefit of Gage, and those who furnished labor or material for said building and have not been paid therefor; that Gage be allowed to have a lien upon the property for the amount of the judgments in favor of certain of the claimants, and for all other claims upon which he is personally liable; that there be an accounting of the claims and liens, assumed by Cameron, or Detlor, or either of them, and that Gage and the other claimants may have liens upon said property; that a decree be entered in favor of said claimants; that Detlor and Cameron may be decreed to pay the same by a short day, and in default thereof that the premises be sold to satisfy the same; that a receiver be appointed, etc.

The answer of Cameron and Detlor to the original bill was allowed by order of court to stand as their answer to the amended bill.

On May 6, 1902, the court entered an interlocutory decree, finding that Gage transferred the premises to Detlor by deed containing the clause above quoted; that they passed to Cameron, charged with "said mortgages, liens, taxes and claims, the said liabilities of said Gage incurred with respect to the erection of said building, and the claims of said persons and corporations that had furnished labor or material or funds for, or had otherwise contributed to, the erection of

said building;" that Cameron completed said building, made a loan, paid out money and received rentals; and by said interlocutory decree the cause was referred to a master to take evidence and report the amount and nature of the mortgages, liens, taxes and claims, existing November 23, 1900, referred to in said deed; also to report the individual liability, incurred by Gage in respect to the erection of said building, and the amounts and nature of the unpaid claims of persons and corporations, holding orders accepted by Gage, and who furnished labor or materials or funds for, or otherwise contributed to, the erection of said building.

Certain creditors, twelve in number, holding claims, amounting altogether to something over $10,000.00, were allowed to come in and file intervening petitions setting up their claims, and the manner in which they were incurred. To these intervening petitions answers were filed by Detlor and Cameron. The amended bill was amended by alleging that McSorley was insolvent.

The master took testimony and made a report, making a statement of the claims against the property. Objections and exceptions were made to the report by Cameron and Detlor to the effect in substance that the claims, referred to in his report and in the final decree hereinafter mentioned, were not of the kind or class included in the assumption clause in the deed from Gage to Detlor, namely, "subject, however, to existing mortgages, liens, taxes and claims of any and every description, which the second party assumes and agrees to pay;" the exceptions also attacked the report upon the ground that it found that Cameron knew or had notice of these claims.

On September 12, 1902, the court overruled the exceptions to the report, and rendered a final decree, modifying the report, however, in some slight particulars. This final decree found that on October 21, 1899, Anna Connell conveyed the premises by warranty deed of that date to Gage, a son of a prominent citizen of Chicago of means, but himself without

means; that Gage acquired title as part of a plan of McSorley to erect a building on the property to be paid for out of a building loan, and was to make contracts for that purpose, Gage being held out as owner; that Gage was to do the things and sign the papers necessary on his part for that purpose, and was to be protected by holding the title, and out of said loan, from loss, and was to receive $500.00 for holding the title; that McSorley used the name of Central Brick Manufacturing and Stone Company, sometimes called by him Central Brick and Stone Company, a corporation of which he was president, and held out said corporation to be the original contractor for said building, but that the same was merely an instrumentality in his hands for carrying out said purpose; that the deed from Connell to Gage was not recorded until November 23, 1900, but that Gage was held out as owner to those furnishing material and labor for the building, to whom it was stated that a loan would be made to pay the claims; that Gage became personally liable on certain claims specified; that McSorley was insolvent, but had some credit and borrowed some money, and used it in the building, and had secured much material and labor; that payment came due for material, labor and borrowed money, and to postpone payment of the same McSorley, personally or through his company, gave written orders addressed to Gage payable out of the loan to be made, which were accepted in writing by Gage payable out of said loan, or absolutely; that Gage accepted the same with the understanding that he should be protected out of the loan, and by holding the title; that he personally gave his orders addressed to Hoffmeyer & Fitzgerald, real estate agents, endeavoring to place said loan; that Gage and McSorley endeavored to make said loan for said purpose and to complete the building, and represented to contractors and others, who furnished material, labor or money, that they should be paid out of the loan as soon as made; that relying upon such representations said persons furnished money, supplies, etc., and

extended credit therefor; that among such persons was the Kellogg-Mackay-Cameron Company, a corporation of which Cameron was an officer; that said company furnished material for heating apparatus to the value of $3000.00, payment for which fell due in the summer of 1900, and which could not be collected as the loan had not been made; that, during the summer and fall of 1900, Cameron was informed of, and knew generally the way, in which the title was held by Gage, and that obligations for building had been incurred, and that it was necessary to make a building loan to pay the same; that, as Gage and McSorley could not obtain a loan in the fall of 1900, application was made on October 11, 1900, to Cameron, a man of means, to take the title, obtain the loan, complete the building, and make payments in connection therewith; that Cameron obtained from Gage and wife a deed in usual form, conveying the premises to Detlor, a man of small means, and who acted as agent for Cameron; that said deed was dated October 11, 1900, acknowledged October 17, 1900, recited a consideration of $1000.00, but that no money was paid to Gage personally; that said deed, after the description of the premises and the granting words, contains the assumption clause above set forth, and was delivered and recorded November 23, 1900; that said deed was made to Detlor at Cameron's request, and that it was understood and intended that Detlor took title, as agent or trustee for Cameron, who would protect him from liability; that, when said deed was executed, certain claims existed, which were contemplated by, and referred to in, said assumption clause; that some of these claims Gage had become liable to pay, and others had been actually brought to Cameron's notice at or before the delivery of the deed; that, in connection with the acceptance and delivery of said deed, there became charged on the said premises among such existing mortgages, liens, taxes and claims, the claims set up in the decree, being the twelve claims above referred to, including those of the appellants John M. L. Sexton, Pyott Foundry

Company, and Norman G. Croall. After setting forth these twelve claims, specifying their nature and character and how they were incurred, the decree finds that these claims are included in the claims referred to in said assumption clause, and are charges upon the premises in question in favor of the respective claimants, who filed intervening petitions. The decree also finds that on December 27, 1900, Cameron procured Detlor to convey the premises to him by warranty deed, reciting a consideration of $30,000.00 and containing this clause: "This deed is subject to encumbrances of record at the day of the date thereof," but that no consideration was paid by Cameron to Detlor for said deed; that Cameron obtained possession in December, 1900, and has since received the rents and profits, and paid for the care and maintenance of the premises. The decree thereupon orders that, unless Cameron pay within twenty days to said intervening petitioners, naming them, the amounts due, and their costs, and the complainant his costs taxed against Cameron, the premises be sold, and provides for distribution and deficiency, and for redemption.

MATZ, FISHER & BOYDEN, for appellants Gage *et al.;* ALEXANDER S. BRADLEY, (J. A. McANROW, of counsel,) for appellant Sexton; DENT & WHITMAN, for appellant Croall; FASSETT & ANDREWS, for appellant the Pyott Foundry Co.

HENRY S. ROBBINS, (J. S. DUDLEY, of counsel,) for appellee.

Mr. JUSTICE MAGRUDER delivered the opinion of the court:

By warranty deed, dated October 11, 1900, acknowledged October 17, 1900, and recorded November 23, 1900, the appellant, Eli A. Gage, deeded the lots here in controversy, "with improvements thereon situated in the city of Chicago," etc., to G. H. Detlor, the deed containing, after the

description of the property, the following clause, to-wit: "subject, however, to existing mortgages, liens, taxes, and claims of any and every description, which the party of the second part assumes and agrees to pay." The main question, presented by the record in this case, relates to the construction and meaning of the assumption clause thus quoted.

On the part of the appellee, Cameron, it is claimed that the assumption clause is merely an exception to the warranty of title; that is to say, that Gage and his wife warrant the title to the real estate, subject to existing mortgages, liens, taxes and claims, or, in other words, warrant the title to be good, except so far as the land is encumbered by such mortgages, taxes, liens and claims. The contention of the appellee is, that the claims, which are excepted from the warranty, can only be claims against the property, upon the alleged ground that only claims against the property affect the title; and it is said that the parties could not have intended to except from the warranty claims, which do not affect the title, and, if they affect the title, they must be shown upon the record to be liens or encumbrances. It is further contended on the part of the appellee that the words, "and claims of any and every description," are to be considered in connection with the preceding words, "existing mortgages, liens, taxes," under the maxim *ejusdem generis,* which is an illustration or specific application of the broader maxim, *noscitur a sociis.* It is claimed that, by the application of this maxim, the general words, "and claims of any and every description," will be restricted to a sense analogous to the less general words, "existing mortgages, liens, taxes." In other words, the rule of construction that, when general words follow particular words, the former can mean only things or persons of the same kind or class as those, which are particularly mentioned, is alleged to be applicable here in construing the assumption clause. The result of the application of this maxim in the manner, contended for by appellee, would be that the grantee in the deed of October 11, 1900, only as-

sumed such claims, as appear of record to be liens upon the property. It is said that the words, "claims of any and every description," can only refer to such claims as are indicated and designated by the previous words, "mortgages, liens, taxes."

If the maxim *ejusdem generis* is to be strictly applied in the present case, then the general words, "and claims of any and every description," are meaningless, and nothing but surplusage. Mortgages are claims which are liens, and taxes are claims which are liens. But the assumption clause makes use of the general word, "liens," which includes not only mechanics' liens, but all kinds of liens. If the intention was to assume the payment of such claims only as are liens, then the use of the general word, "liens," in connection with the words, "mortgages" and "taxes," would have expressed such intention without the use of the words, "and claims of any and every description." The latter words could not have been intended to refer only to such claims as were liens, because the use of the previous word, "liens," expressed the meaning of the parties without the use of the general words, which follow the word, "taxes."

In the first place, in defining the meaning of the maxim *ejusdem generis,* and applying it to the construction of statutes and contracts, the cases, decided by this court, are nearly all cases where the word "other" is used to qualify the general terms, which follow the specific designations. Thus, in *Drake* v. *Phillips,* 40 Ill. 388, a township organization law specified certain purposes, for which taxes might be levied by the town, "or for any other purpose they may deem necessary," and the latter clause was there construed as authorizing taxation only for purposes of the same general scope and character with those already enumerated.

In *Brush* v. *Lemma,* 77 Ill. 496, the statute named several officers and declared the same applicable to "all other officers," and it was held that the latter expression, by a well known canon of construction, referred to officers of the same

class or grade as those previously named. In *Wilson* v. *Board of Trustees,* 133 Ill. 443, where the court had under consideration a section of the constitution, which provided that the General Assembly might vest the corporate authorities of cities, etc., with power to make local improvements "by special assessment, or by special taxation of contiguous property, or otherwise," it was there held that the words, "or otherwise," meant "or otherwise assessing the cost of the improvement against the property actually or presumptively benefited thereby,—that being the kind or class of assessments particularly mentioned;" and, in view of the use of the expression, "or otherwise," the court applied the familiar rule of construction that, when general words follow particular words, the former can mean only things or persons of the same kind or class as those, which are particularly mentioned. In *Misch* v. *Russell,* 136 Ill. 22, a statute provided that the county court should hear and determine contests of election of all other county, township and precinct officers, "and all other officers for the contesting of whose election no provision is made," and it was there held, in view of the use of the expression "all other officers," that the statute included contests of the election of school officers, as they were of the same class as county, city and township officers. In *Webber* v. *City of Chicago,* 148 Ill. 313, where a statute vested in the city council the power to license, etc., "theatricals and other exhibitions, shows and amusements," and where an ordinance referred to circuses, menageries, "or similar games for sport and all other exhibitions, performances," etc., it was held, in view of the use of the words, "other exhibitions," that the rule of construction in question was applicable, that is to say, that when an enumeration of specific things is followed by general words or phrases, the latter are held to refer to things of the same kind as those specified. So, also, in *Gillock* v. *People,* 171 Ill. 307, where a penal statute declared that whoever entered into any dwelling house, etc., "or other building," with intent to commit

robbery or larceny or other felony, should be deemed guilty of burglary, the application was made of the rule of construction here contended for in view of the use of the words "other building." In *Adams* v. *Akerlund,* 168 Ill. 632, where a treaty made use of the words "goods and effects," we said (p. 637) : "If the expression here, instead of being 'goods and effects,' was 'goods and other effects,' we should be inclined to apply the rule of construction, that general and specific words, which are capable of an analogous meaning, being associated together, take color from each other, so that the general words are restricted to a sense analogous to the less general. (*Misch* v. *Russell,* 136 Ill. 22 ; *First Nat. Bank of Joliet* v. *Adam,* 138 id. 483). Thus, in the case of *First Nat. Bank of Joliet* v. *Adam, supra,* where the words used were, 'all goods, chattels or other property,' it was held that the general words, 'or other property,' would be restricted to a meaning analogous to the meaning of the words, 'goods and chattels,' and consequently would not embrace such property as fixtures or chattels real, partaking more of the nature of realty than personalty. So, here, if the expression were, 'goods and other effects,' the words, 'other effects' would be restricted to a meaning analogous to the meaning of the word, 'goods,' and would not embrace real property. But, as the word 'other' is not used, there is no occasion for the application of the maxim, *ejusdem generis.*"

In the case at bar, the assumption clause is not, "existing mortgages, liens, taxes and other claims of any and every description." The word "other" nowhere appears as qualifying the general clause after the setting forth of the specific words. In this respect the case at bar differs from the cases above referred to decided by this court, where application has been made of the maxim *ejusdem generis.*

In the second place, the rule, that, where an enumeration of specific things is followed by general words or phrases, the latter are held to refer to things of the same kind as those specified, is only one of the many rules of construction,

which are employed for the purpose of ascertaining the intention of the legislature, or of the contracting parties, as expressed in a statute or contract sought to be construed; · "and where from the whole instrument a larger intent may be gathered, the rule under consideration will not be applied in such manner as to defeat such larger intent;" or the rule will not be applied where from the whole statute or contract a larger intent may be gathered, if the application of the rule will operate to defeat such larger intent. (*Webber* v. *City of Chicago,* 148 Ill. 313, and authorities referred to on p. 318). In the case at bar, the words in the assumption clause, "and claims of any and every description," were evidently intended to have a larger meaning than the words "mortgages, liens, taxes." To be sure, "mortgages, liens, taxes," refer to claims, which are encumbrances upon the property and are shown of record to be such. But the words, "and claims of any and every description," have a larger meaning than claims, which are mere encumbrances shown of record to exist against the property. In other words, the assumption clause not only intended to include claims which were liens, but also claims of any and every description, connected with the property and improvements conveyed, whether such claims were liens or not; that is to say, such claims as are mentioned in the interlocutory decree of May 6, 1902, referred to in the statement preceding this opinion.

In the third place, "the restriction of general words to things *ejusdem generis* must not be carried to such an excess as to deprive them of all meaning. The enumeration of particular things is sometimes so complete and exhaustive as to leave nothing, which can be called *ejusdem generis.* If the particular words exhaust a whole *genus,* the general words must refer to some larger class." (*Gillock* v. *People,* 171 Ill. 307). In the case at bar, to limit the meaning of the general words, as used in the assumption clause, to claims *ejusdem generis* with those specifically named would be to render the general words practically meaningless. The particular words,

212—11

"mortgages, liens, taxes," exhaust the whole *genus* of claims which are shown of record to be encumbrances upon the property, and, therefore, the general words, "and claims of any and every description," must refer to some larger class. The maxim *ejusdem generis* "must yield to another equally salutary rule of construction, viz., that every part of a statute should, if possible, be upheld and given its appropriate force." (*Misch* v. *Russell, supra*). If, by the assumption clause, the grantee in the deed of October 11, 1900, only assumed the payment of claims, which were liens upon the property in question, then the general words, "and claims of any and every description," could not be given their appropriate force, as they are broad enough to include a larger class of claims than those designated by the specific words used. In *Mittel* v. *Karl,* 133 Ill. 65, we held that words, placed in a deed by the contracting parties for a purpose, could not be arbitrarily rejected; and we there said (p. 68) : "In the construction of written contracts it is the duty of the court to ascertain the intention of the parties, and the intention, when ascertained, must control; but in arriving at the intention, effect must be given to each clause, word or term employed by the parties, rejecting none as meaningless or surplusage." (See also *Hayes* v. *O'Brien,* 149 Ill. 403 ; *Minnesota Lumber Co.* v. *Coal Co.* 160 id. 85 ; 2 Parsons on Contracts,—6th ed.—p. *505). Bishop in his work on Contracts, (sec. 384) says : "Every clause and even every word should, when possible, have assigned to it some meaning. It is not allowable to presume or to concede, when avoidable, that the parties in a solemn transaction have employed language idly." In the case at bar, the restriction of the general words, used in the assumption clause, to such claims as are designated by the previous specific words would not be giving effect to such general words, but would amount to a rejection of the same as meaningless or surplusage.

It is said that the intention of the parties in the use of the words in the assumption clause must be determined from

the language of the clause itself, and that parol testimony cannot be introduced for the purpose of proving what the intention of the parties was. Undoubtedly, parol testimony for the purpose of showing the intention of the parties is not permissible. (*Fowler* v. *Black*, 136 Ill. 363; *Skelton* v. *Dustin*, 92 id. 49).

But while it is true that parol evidence cannot be introduced to contradict or vary the terms of a valid written instrument, yet such evidence is admissible for the purpose of explaining written instruments by showing the situation of the parties in their relations to persons and things around them, or, as is sometimes said, by proof of the surrounding circumstances. (1 Greenleaf on Evidence, secs. 275, 282, 286-288; 2 Parsons on Contracts, pp. *561, *563). In such cases, oral evidence may be resorted to for the purpose of showing the circumstances surrounding the parties at the time the instrument was executed, so that the court may view the instrument from the standpoint of the parties, who executed it, and be thereby the better enabled to determine the sense in which the words used were intended to be understood. In *Minnesota Lumber Co.* v. *Coal Co.* 160 Ill. 85, we said (p. 92): "Contracts should be construed in the light of the circumstances surrounding the parties, and of the objects which they evidently had in view. The circumstances, which both parties had in view at the time of making the contract, may be referred to for the purpose of determining the meaning of doubtful expressions." In *Drury* v. *Holden*, 121 Ill. 130, where the court had under consideration a clause in a deed where the grantee assumed certain encumbrances, it was said that parol evidence could be introduced for the purpose of showing what constituted the consideration of the deed, and that, as the amount of the encumbrance it assumed, was included in, and formed a part of, the consideration, the oral evidence was clearly competent under the rule, which permits parol evidence upon the subject of the consideration of a deed. (See also *Hayes* v. *O'Brien*, 149

Ill. 403; *Louisville and Nashville Railroad Co.* v. *Koelle,* 104 id. 455; *Hadden* v. *Shoutz,* 15 id. 581; *Batavia Manf. Co.* v. *Newton Wagon Co.* 91 id. 230). In *Louisville and Nashville Railroad Co.* v. *Koelle, supra,* it was held that the ordinary rule, that the rights of the parties must be ascertained from the words of the deed, is subject to the modification, that surrounding circumstances may be taken into consideration in order to ascertain the intention of the parties to the deed.

In *Siegel* v. *Borland,* 191 Ill. 107, we said, in discussing the question of the assumption of an indebtedness by the grantee in a deed (p. 111): "It is true that a contract may be implied, and that, if the amount of an encumbrance is included in, and forms a part of, the consideration which a grantee promises to pay for premises, and he retains that part of the purchase price, the law will create a personal liability against him, on the ground that he has agreed to pay such indebtedness. In such a case, the law presumes that the grantee has agreed to apply the money so retained for the purpose of paying the encumbrance. Either there must be an express assumption of the indebtedness, or the amount must be allowed in the purchase price so that the law will imply the promise.  *  *  *  The implied contract to pay to the holder of an encumbrance money retained for that purpose arises only from the presumed understanding of the parties. It is implied, because the facts justify the inference that such was the mutual intention; but an implied contract cannot exist when there is an express one about the same subject matter. It is only where the parties do not expressly agree that the law implies a promise."

The language of the assumption clause here under consideration is, "subject, however, to existing mortgages, liens, taxes," etc. The mortgages, assumed by the grantee, are not specifically described, but parol testimony would certainly be admissible to prove what the mortgages upon the property conveyed were, so as to show what mortgages

were assumed by the grantee. Parol proof is necessary in such case to explain what mortgages are referred to by the word "mortgages." "The identity of the mortgage assumed, when left in doubt by the terms of the deed, may be shown by parol evidence." (1 Jones on Mortgages,— 5th ed.—sec. 740a). If parol testimony can be introduced to show what particular mortgages and taxes upon the property are embraced in the general words, "mortgages" and "taxes," then parol evidence can also be introduced to show what claims were embraced within the words, "and claims of any and every description." The presumption is, that these claims and mortgages and taxes and liens were assumed as a part of the consideration of the conveyance, and it is always admissible to introduce parol evidence to show the real consideration of a deed.

The circumstances, surrounding this transaction, as developed by the evidence, are substantially as follows: McSorley desired to purchase some real estate for the purpose of constructing a building of flats. Being insolvent he did not desire to take title in his own name, or to make contracts for the construction of the building in his own name. He persuaded Gage, a young man whose father stood high in the community as a man of means and financial ability, to take the title to the property, and hold it for him, McSorley. Accordingly, through the efforts of McSorley, a contract was made by Mrs. Connell, the owner of the property, to sell it to Gage. Mrs. Connell executed a deed, dated October 21, 1899, conveying the lots to Gage. The contract for the sale of the property by Connell to Gage, and the deed from Connell to Gage, were put in escrow in the possession of the Chicago Title and Trust Company. Gage did not pay a cent for the property, and it was agreed that he should have $500.00 for his services in holding the title. It was also understood that, by the holding of the title, he was to protect himself against the claims of parties, furnishing labor and material for the construction of the building. Although

the title was not of record in Gage, because the deed to him was held in escrow, yet he was held out as the owner of the property. On December 12, 1899, a contract was entered. into between Gage and an alleged corporation, called the Central Brick and Stone Company, for the construction of a building upon the lots in question at a cost of $48,000.00. It is not certain from the evidence whether any such corporation as the Central Brick and Stone Company existed, but McSorley made use of the name of the Central Brick and Stone Company, because he was insolvent and dared not use his own name. All the contracts, which were made for the furnishing of labor and material, were made with the Central Brick and Stone Company, and not with McSorley, although they were really and in effect the contracts of McSorley, who claimed to be president of the company. It was understood that, as soon as the construction of the building had proceeded to a certain extent, a building loan should be obtained upon the building, the mortgage securing the same to be executed by Gage. After the building contract of December 12, 1899, had been executed, the construction of the building was commenced and carried on. Gage and McSorley were unable to obtain a loan upon the property. Many orders were given to men, furnishing materials and labor upon the building, drawn upon Gage, and to be paid out of the loan to be made upon the property by Gage. These orders were accepted in writing by Gage. A corporation, in which Cameron was interested, furnished a heating apparatus, costing about $3000.00, to be put into the building in question. Cameron was unable to obtain his money. Negotiations were then carried on between McSorley and Cameron for the purpose of inducing Cameron to take the title to the building, and obtain a loan upon the same, in order to pay the parties, who had furnished labor and material. The evidence shows that in this matter McSorley and Cameron acted together. McSorley was really an agent of Cameron to procure for the latter the title to the property. Cameron was to be substi-

tuted for Gage, and take the title, in order to obtain a loan. He did afterwards obtain a loan of $40,000.00 upon the property.

A series of efforts were begun by McSorley and Cameron to obtain title. Gage was induced to execute a deed to Detlor, who was an employe and book-keeper of Cameron. The evidence is quite clear that McSorley was instrumental in inducing Gage to convey the title to Detlor. In November, 1900, an indemnity mortgage or contract was executed by McSorley to Gage, which recites that Gage had personally incurred certain indebtedness in connection with the erection of the building in behalf of McSorley, and that McSorley had agreed to hold him safe and harmless; and it also recites that McSorley was desirous that Gage should transfer and convey the legal title to Detlor, and that Detlor was about to enter into a contract with McSorley in reference to the property; and, by the terms of this indemnity instrument, McSorley conveys an undivided quarter of three of the lots to Gage, and sells him an undivided half interest in the contract between McSorley and Detlor. And this is stated in the instrument to have been done for the purpose of protecting Gage against any loss or liability, that he might incur, or had incurred by reason of holding the title to the property, and by reason of having made contracts and accepted orders and incurred bills in connection with the erection of the building. Accordingly, on October 11, 1900, Gage executed to Detlor the deed, which contains the assumption clause above quoted. This deed was drawn by a real estate agent by the name of Hoffmeyer, and the testimony shows that the assumption clause was put in for the express purpose of protecting Gage against the claims of these parties, who had furnished material and labor for the construction of the building. The evidence tends to show that Cameron, when the deed was made to Detlor, had full knowledge of the relations of Gage, and Connell, and McSorley, and of these claimants, to the property and building in question.

No consideration whatever was paid to Gage by Detlor for the transfer of the property to the latter. As we understand the evidence, the deeds from Connell to Gage, and from Gage to Detlor, were both delivered at the same time, to-wit, on November 23, 1900. The case stands in the same position as though the deed had been made by Gage to Cameron, instead of being executed to Detlor. Detlor was the agent and clerk of Cameron and took the title for him. Cameron says: "I told McSorley I would not take title, as a large loan would have to be made, and I didn't want to sign the notes. I put the title in my book-keeper, so he could sign the paper, and I would assume no obligation thereby. * * * I never saw the deed. Dudley acted for me in receiving it." Elsewhere it is shown by the evidence that the title was taken ·in the name of Cameron's book-keeper as a matter of convenience to Cameron, and Cameron himself says that the deed was taken for his benefit. Cameron also says: "At no time prior to the deed from Gage to Detlor had I any agreement with anyone respecting these claims, other than that mentioned in the deed. The language in that deed with respect to claims to be paid has not been changed by any agreement with anybody. Detlor had nothing to do with any of these transactions. Detlor is our book-keeper and looks after my books for me. He has for five or six years. He is twenty-six or twenty-seven years old; not much means; probably $3000.00 or $4000.00 in personal property. I simply told him what I wanted him to do. It was satisfactory to him. He was not protected in any way. It was my intention to protect him." Cameron also says that he dealt with McSorley, and his testimony shows that he knew that McSorley's company had contracted to erect the building, and that the owner could not get a loan, and could not go ahead with the building, and he says that McSorley told him he could procure title for him, Cameron. McSorley also told Cameron that Gage had a contract to buy the property from Connell.

Under the facts thus narrated, it is unquestionably true that the assumption of these claims by Detlor was an assumption of them by Cameron himself. "If the conveyance be to a trustee, who assumes an existing mortgage, and the trustee holds the title for the benefit of others, who paid the consideration, in case of a deficiency each beneficiary under the trust is liable therefor in proportion to the amount of his separate interest in the property." (1 Jones on Mortgages, sec. 740*b*). Detlor held the property in trust for Cameron, and assumed the payment of the claims. The consideration for the conveyance to Detlor passed, not from Detlor, but from Cameron, and Cameron, being the beneficiary under the trust held by Detlor, is liable for the payment of the claims whose payment was assumed by Detlor. It is true that, soon after the deeds from Connell to Gage and from Gage to Detlor were delivered and recorded, and on December 27, 1900, Cameron obtained a deed from Detlor to himself. This latter deed was without any consideration whatever, and, although the deed from Detlor to Cameron had a clause in it to the effect that it was subject to the encumbrances of record at the date thereof, yet we are of the opinion that Cameron could not relieve himself from the liability to Gage and these claimants, assumed by the assumption clause in the deed from Gage to Detlor, by any language which was put in the deed of the property made to him by his book-keeper, Detlor.

The evidence shows that the building upon this property was finished to the extent of two-thirds thereof when Cameron or Detlor obtained the title to it. The testimony shows that the lots and buildings are now worth from $75,000.00 to $80,000.00 and that in November, 1900, when this transfer was made, they were worth upwards of $50,000.00. It is difficult to see what adequate consideration Cameron paid for this property, if it was not the understanding and agreement that he should pay off the claims that existed in favor of those, who had furnished materials, and labor, and money, for the construction of the building. The amount, which

Cameron paid to Connell in order to obtain the deed from Connell to Gage, was small, when compared with the value of the property and the improvements thereon. As Gage received no consideration for the deed which he made to Detlor, Cameron obtained the property for a very small consideration if it was not true, as is claimed by the appellants, that he was to make a loan upon the property, and pay off all the claims existing in favor of those, who had furnished materials and labor.

The parties holding these claims—many of them, or their agents and representatives—went to see Cameron when they heard that he was to buy the property and make a loan upon it. Some ten or eleven witnesses swear that Cameron, or his attorney, or agent, told them that he would pay off these claims when he obtained the title to the property and negotiated a loan upon it, which he afterwards did to the extent of $40,000.00.

It is true that the deed from Gage to Detlor did not run to Cameron himself, but the evidence shows that one Dudley was the attorney and agent of Cameron and represented him in the matter of the deed, and the deed was delivered to Dudley for Cameron, as the deed also from Connell to Gage was at the same time delivered to Dudley. Although a party does not sign a deed, under which property is conveyed to him and which contains an assumption clause, yet if he accepts the instrument and places it upon record, such acceptance of the deed with the knowledge of its contents binds him as effectually as though the deed had been executed by him. (*Dean* v. *Walker*, 107 Ill. 540; 2 Warvelle on Vendors,—2d ed.—sec. 646). Cameron, being a grantee from Detlor and chargeable with notice of the assumption of these claims by Detlor, from whom he received a conveyance, the land in Cameron's hands was subject to the lien created by the deed. (*Sidwell* v. *Wheaton*, 114 Ill. 267; 1 Jones on Mortgages, secs. 740, 740*b; Markoe* v. *Andras*, 67 Ill. 34; *Carpenter* v. *Mitchell*, 54 id. 126).

A charge upon land may be created by contract, and here the words of the assumption clause created a charge upon the land conveyed by Gage to Detlor, or Cameron. (*Sidwell* v. *Wheaton, supra; Markoe* v. *Andras, supra; Drury* v. *Holden,* 121 Ill. 130; 1 Jones on Mortgages, secs. 736, 740; 2 Warvelle on Vendors,—2d ed.—sec. 647).

In addition to what has been said, it appears that some of these claimants filed petitions for mechanics' liens, which petitions are still pending. It furthermore appears that some of the claimants, who were entitled to mechanics' liens and would have filed petitions for the same, abstained from doing so, because of Cameron's assurances that their claims would be paid when the loan should be negotiated. It also appears from the evidence that Cameron did, as a matter of fact, make payments in cash to some of these claimants, and made agreements of settlement with others, by the terms of which he was to pay partly in money and partly in notes. When, however, he had obtained the title to the property in the manner above stated, he repudiated all these agreements and obligations.

Gage has a right to file the present bill. "Where the vendee of mortgaged property has assumed the payment of the mortgage, the mortgagor may proceed in equity to compel such vendee to whom he stands in the situation of a mere surety to discharge the debt for his protection." (2 Warvelle on Vendors,—2d ed.—sec. 651; *Bay* v. *Williams,* 112 Ill. 91).

The petitioners here, who filed intervening petitions, had a right so to intervene. "An intervenor has the right to claim the benefit of the original suit and to prosecute it to judgment. Such right cannot be defeated by the dismissal of the suit by the plaintiffs after the filing of the petition and notice thereof to such plaintiffs." (11 Ency. of Pl. & Pr. p. 509). In *Shannahan* v. *Stevens,* 139 Ill. 428, we held that a person interested in the subject matter of a bill, who is a necessary party, has the right, on his motion, to intervene

and become a party to the suit, even after the bill has been dismissed under a stipulation with the complainant, when his motion is made at the same term the suit is dismissed. (*Marsh* v. *Green,* 79 Ill. 385; *Poehlmann* v. *Kennedy,* 48 Cal. 201).

"The rule is perfectly well settled, that a party may by express agreement create a charge or claim in the nature of a lien on real as well as personal estate of which he is the owner or possessor, and that equity will establish and en-, force such charge or claim, not only against the party who stipulated to give it, but also against third persons, who are either volunteers or who take the estate on which the lien is agreed to be given, with notice of the stipulation. Such an agreement raises a trust which binds the estate to which it relates; and all, who take title thereto with notice of such trust, can be compelled in equity to fulfill it." (*Pinch* v. *Anthony,* 8 Allen, 539). Under these authorities, and others above referred to, claims, when specifically named, may be made charges by contract against land; and, if this be so, there is no reason why such claims may not be charged by contract against land, when they can be made specific by proof. In the case at bar, the claims referred to in the assumption clause have been made specific by proof. The evidence shows that Cameron either had actual or constructive notice of the claims mentioned in the decree below. Before he concluded to take the title from Gage he employed McSorley and Dudley, an attorney, to make a list of the claims against the property, and this list was examined by him, or by his attorney, before he took the title to the property.

In the case of the appellant Croall, the following order on Gage was given to Croall, to-wit:

"CHICAGO, *March 8, 1900.*
"*To Eli A. Gage, care of Hoffmeyer & Fitzgerald:*
·'Please pay to J. Jackson Todd, agent, the sum of $3000 out of moneys due us for construction of building at 5420 to 5428 Indiana avenue, and charge to our contract on said building.
                    CENTRAL BRICK AND STONE CO.,
                    JOHN McSORLEY, *Pres.*"

On the back of this Gage made the following entry and signed it under seal:

"Value received hereby accept this order and agree to pay same according to its terms, and I do acknowledge said order to be a valid and subsisting lien against the premises in question.

ELI A. GAGE.   (Seal.)"

This contract in writing was an express contract, creating a lien in favor of Croall, or his agent, Todd, upon the property in question. So far, therefore, as the Croall claim is concerned, it would be embraced under the word "liens" in the assumption clause if it were not included under the general clause, "and claims of any and every description." The evidence tends to show that Cameron, before he took the title, had notice of Croall's claim. Certainly, the circumstances were such as to put him upon inquiry, and he could easily have ascertained all the facts about the claim by inquiring of Gage, whom he knew to be the holder of the legal title. Counsel for appellee claims that the acceptance of Gage in writing of the order upon him in favor of Todd, as above set forth, was not sufficient under the Statute of Frauds, upon the alleged ground that it did not identify the property. The acceptance acknowledges the order to be a valid and subsisting lien upon the premises in question, and when we look at the order upon which the acceptance is indorsed, it refers to moneys due for construction "of building at 5420 to 5428 Indiana avenue." We think the reference to the property by the numbers on Indiana avenue was a sufficient identification of it.

After a careful examination of the whole record, we are of the opinion that the decree of the circuit court was correct.

Accordingly, the judgment of the Appellate Court is reversed, and the decree of the circuit court is affirmed.

*Judgment reversed.*