FRED OPEL v. ANNA SHOUP, *et al.*, Appellants.

**Descent and Distribution:** CONFLICT OF TREATY AND STATUTE. Under Constitution of the United States, article 6, providing that the constitution, laws made in pursuance thereof, and federal treaties with foreign countries, shall be the supreme law of the land, notwithstanding anything in the constitution or laws of a state, to the contrary, a federal treaty with a foreign country, conferring on its subjects, notwithstanding their alienage, a qualified right to take by inheritance lands in the United States, under the laws here controlling its descent, must prevail over a state law prohibiting aliens from taking lands by descent.

**SAME:** *Federal power.* A federal treaty with a foreign country, which, by conferring on subjects of that country a right, notwithstanding their alienage, to take by inheritance lands in the United States, according to the laws here controlling its descent, removes from them the disability imposed by a state statute prohibiting aliens from inheriting lands within its limits,- does not alter the laws of descent of the state so as to render it unconstitutional, as an infringement of the right of the state to control its internal policy.

**Construction of Will.** A will, after devising the testator's entire estate in trust to his executor, to be invested so as to produce an income, provided that the income should be paid to his wife so long as she remained a widow; that, if she re-married, one-half of his estate should be paid to her, and the other half to his sister, or if his sister was then dead, divided equally among his heirs at law by blood kinship. *Held,* that the sister, on the death of the wife without having re-married, was entitled to take only as an heir.

*Appeal from Johnson District Court.*—HON. M. J. WADE, Judge.

SATURDAY, DECEMBER 12, 1896.

NOTE.—The effect of treaties upon an alien's right to inherit, is considered in an extensive note to *Re Rixner* (La.) 32 L. R. A. 177.

ACTION in equity to determine the interest of the several parties in lots 1, 2, and 3, block 51, in Iowa City, belonging to the estate of John C. Hormel, a resident of Iowa, who died at Iowa City, testate, April 13, 1892. All the defendants except the wife and children of F. C. Hormel, deceased, appeal from the decree rendered.—*Affirmed.*

*Robinson & Patterson* for Anna Shoup, appellant.

The court erred in holding that said Anna Shoup took nothing under said will, but was only entitled to one-tenth of said estate as heir of John C. Hormel, deceased.

The intent of the testator is the first great subject of inquiry.

*Murphy v. Black,* 44 Iowa, 177; 1 Redfield Wills, pages 434, 435, Rule 21; *Clarke v. Johnston,* 85 U. S. 18 Wall. 493, 21 L. Ed. 904; Schouler, Wills, section 466; 1 Redfield, Wills, 3d Ed. page 432, cl. 17.

In drafting the will, Mr. Hormel had the estate in his mind's eye, divided into two equal parts, one being his wife's portion, the "other half" being the portion to be given to Anna Shoup on division provided for in the will. In case of said sister's death, before division, then he calls it "the one-half my estate," meaning thereby his own part of the estate that had failed to have passed to the sister, by her death before division, which, in that event, was to go to his heirs by blood kinship.

The condition of re-marriage of Mrs. Hormel did not in the least affect Mrs. Shoup's interest, it only affected the interest of Mrs. Hormel in this, that in

such event, she was to lose the interest earned by half the estate, the payment of which was then to cease.

*Remley & Ney* for appellants Schultze, *et al.*

This will provides that the entire estate shall be placed in the hands of a trustee. It is not, and does not purport to be a disposition of only one-half of his estate, the other half of which he recognizes by law would go to his widow without a will, but it is a disposition of all the property of which he died seized.

*Snyder v. Miller*, 67 Iowa, 261; *Severson v. Severson*, 68 Iowa, 656.

The appellants are the heirs of John C. Hormel, and no heirs having been found under the rules of descent laid down in sections 3657–3661 of McClain's Code, inclusive, the property of the said Elizabeth Hormel, deceased, goes to the heirs of her deceased husband, under section 3662 of McClain's Code.

The treaty simply provides, when a citizen of one of the contracting parties holding property in the territory of the other contracting nation dies, and such property, by the law of the land, descends to the citizen or subject of the nation of which the decedent was a citizen, then such heir shall be allowed two years to withdraw the proceeds, and that no duty shall be imposed by reason of such withdrawal. In other words, the term "any person" relates to a citizen of one country holding property in the territory of another.

*Frederickson v. Louisiana*, 64 U. S. 23 Howard 445, 16 L. Ed. 577.

The interpretation of the treaty sought to be placed by the appellee, would make it possible for the President, with the approval of the Senate, to rob the states of one of their inherent powers as sovereign states.

A treaty cannot change the Constitution of the United States.

*207½ lbs. Papers Smoking Tobacco v. United States* (*"The Cherokee Tobacco"*), 78 U. S. 11 Wall, 616, 20 L. Ed. 227.

The regulation of descent is not a matter given to the United States government by the Constitution; hence, it is reserved to the states.

*Watkins v. Holman*, 41 U. S. 16 Pet. 63, 10 L. Ed. 888; *Wilcox v. Jackson, McConnel*, 38 U. S. 13 Pet. 498, 516, 10 L. Ed. 264, 273; *Kerr v. Moon*, 22 U. S. 9 Wheaton, 565, 570, 6 L. Ed. 161, 163; *United States v. Crosby*, 11 U. S. 7 Cranch, 115, 3 L. ed. 287; *Robinson v. Campbell,* 16 U. S. 3 Wheaton 212, 4 L. Ed. 372.

The descent and heirship of real property are governed by the laws of the country where it is located. Story, Confl. L. sections 424, 428.

Elizabeth Hormel having died, her mother, who was a non-resident alien, could not, under the provisions of section 1, inherit property from the deceased. One could not inherit land through an alien ancestor.

*Furenes v. Mickelson*, 86 Iowa, 508; *Bennett v. Hibbert*, 88 Iowa, 154; *Re Gill*, 79 Iowa, 296, 9 L. R. A. 126.

Treaties made under authority of the United States are the supreme law of the land (Article 6, Constitution of the United States), but a treaty not authorized by the Constitution is not the supreme law.

Article 1 of the treaty between the United States of America and Bavaria, is as follows: "Every kind of *droit d'aubaine, droit d're traite,* and *droit detraction,* or taxes on emigration, is hereby and shall forever remain abolished between the two contracting parties, their citizens and subjects respectively."

Article 2. "Where on the death of any person holding real property within the territory of one

party, such real property would, by the law of the land, descend to a citizen, or subject, of the other were he not disqualified by alienage, such citizen, or subject, shall be allowed a term of two years to sell the same, which may be reasonably prolonged according to circumstances, and withdraw the proceeds thereof without molestation, and exempt from all duties of detraction."

Article 3 provides that the citizen, or subject, of each of the contracting parties shall have the power to dispose of their real and personal property within the states of either by testament, donation, or otherwise, etc.

Our contention is, that the term, "any person," in Article 2, relates to a citizen of one country holding property in the territory of the other. This construction is that adopted by the department of state. Opposite the section is the following note:   "Death of citizens of one nation in territory of the other."

D'aubaine, in the French law, is a rule by which all property of the deceased foreigner, whether movable, or immovable, is confiscated to the state to the exclusion of his heirs, whether claiming ab in testato, or under a will of the deceased. Black's Law Dictionary and Bouvier's Law Dictionary.

Article 1 of the treaty abolishes the right to confiscate property, etc., but does not fix the time for removal, nor does it prohibit a duty upon removal, and for this purpose alone was the second section enacted.

The three rights claimed by sovereign states, referred to in article 1 of the treaty, related alone to cases where a foreigner died within the state.   There was no application, and could be none, of the rights therein named which were formerly claimed by the state, except where a foreigner died having property within the territory of the state, which claimed the

right to escheat the property to the state. Hence, the terms become meaningless when applied to a citizen of the United States, and the property situated therein, of which he died seized. The term, *droit d'aubaine*, means the right to confiscate the property within the territory of a state or power, belonging to a citizen of some other state or power, upon the death of the owner thereof. This central idea runs through the whole treaty.

In construing a treaty with Wurtemberg, which is identical with the Bavarian treaty, the supreme court of the United States, in *Frederickson, et al., v. State of Louisiana*, 23 Howard, 445, holds that the treaty does not regulate the testamentary disposition of citizens or subjects of the contracting powers, with reference to property within the country or origin of their citizenship; the case of a citizen or subject of the respective countries residing at home, and disposing of property there in favor of a citizen or subject of the other, was not in contemplation of the contracting powers, and is not embraced in this article of the treaty.

It will not be contended that the federal government has had the power to prescribe rules of descent for the citizens of the state, granted to it. A treaty made outside the powers conferred by the constitution, is not the supreme law of the land.

A treaty cannot change the Constitution of the United States. *The Cherokee Tobacco Case*, 11 Wall. 616.

An act of congress may supersede a former treaty. *Ibid.*

The "legislature regulates descent and the conveyance of real estate. To define the rights of debtors and their creditors, is their common duty. The whole range of remedies lies within their province." *Watkins v. Holman*, 16 Peters, page 63.

"The state has an undoubted right to legislate as she may please in regard to the remedies to be prescribed in her courts, and to regulate the disposition of the property of her citizens by descent, devise or alienation."

*Wilcox v. Jackson*, 13 Peters, 498, on page 516.

Again, on page 517: "We hold the true principle to be this: That whenever the question in any court, state or federal, is whether the title to land which has once been the property of the United States has passed, that question must be resolved by the laws of the United States; but whenever, according to these laws, the title shall have passed, then the property, like other property in the state, is subject to state legislation."

It is an unquestionable principle of law that the title to and disposition of real estate must be exclusively subject to the laws of the country where it is situated.

*Kerr v. Moon*, 9 Wheaton, 565.

*Robinson v. Campbell*, 3 Wheaton, 212.

*United States v. Crosby*, 7 Cranch, 115.

*Wunderle v. Wunderle*, 33 N. E. Rep. 195, in construing article 6 of the constitution, states a rule too broad, and is not sustained by the authorities which it cites.

Chapter 85, of the acts of the Twenty-second General Assembly of Iowa, provides: "Non-resident aliens are prohibited from acquiring property, or taking or holding any lands in this state by descent, devise, or purchase, or otherwise, only as herein provided." None of the exceptions apply to the facts in this case.

A party cannot inherit land through an alien ancestor.

*Furenes v. Nickelson*, 86 Iowa, 508.

But a non-resident alien can take by will in the manner and form prescribed in the second section of chapter 85 of the Acts of the Twenty-second General Assembly.

*Bennett v. Hibbert*, 88 Iowa, 154.

*In re Gill*, 79 Iowa, 296.

*J. A. Edwards* for appellee.

The treaties between the United States and the different German states (including Bavaria), were not abrogated by their absorption into the German empire, and Bavaria still retains its entity, and identity, as a constitutional monarchy.

See *Wunderle v. Wunderle*, 33 N. E. Rep. 195.

See *In re Thomas*, 12 Blatch, 370.

It is within the treaty making power of the United States to remove the disability of alienage, and to enable persons to come within the statutes of descent of the different states, and inherit real estate, who would otherwise be disabled from so doing by reason of such alienage.

See *People v. Gerke & Clarke*, 5 Cal. 381.

See *Chirac v. Chirac*, 2 Wheaton, 259.

See *Hughes v. Edwards*, 9 Wheaton, 489.

A treaty with a foreign nation, which stipulates that subjects of such other nation may inherit real estate in this country, notwithstanding such alienage, suspends the laws of the different states so far as they purport to prevent such foreign subjects, on account of their alienage, from taking property by inheritance in the United States from citizens therein.

See *Godfrey v. Riggs*, 133 U. S. 258.

See *Wunderle v. Wunderle*, 33 N. E. Rep. 195.

GIVEN, J.—The last will and testament of John C. Hormel, deceased, provides as follows: "After my death, I desire that my estate, of whatever name and nature, be placed in the hands of a trustee, hereinafter named, to be by him invested so as to be productive of good interest, and in such manner as he may deem safe.

(2) I desire that the entire proceeds of said investment of my estate shall be paid at the end of each year to my wife, Elizabeth Hormel, so long as she shall remain my widow. If she marries again, then I desire that one-half of my estate be paid to her for her own free use and behoof, and the other half to be paid to my sister Anna Shoup, now living at Springfield, Illinois. In case my sister dies before the division of my estate is made as above provided, then I desire that the one-half of my estate be divided equally between my heirs at law by blood kinship."

A. A. Ball was appointed in the will as trustee and sole executor, and qualified as such.

The first contention is whether the defendant (appellant) Anna Shoup, is entitled to one-half of the property in question under said will.

John C. Hormel died April 13, 1892, without issue, leaving his wife, Elizabeth Hormel, and his sister Anna Shoup, surviving him; his parents, brothers, and sister, other than Anna, having departed this life prior to his death. Elizabeth Hormel died, intestate, November 29, 1892, not having married again. The rules for construing wills are so well understood, and of such frequent application that we need not refer to the many authorities cited; it is sufficient that we refer to *Kiene v. Gmehle*, 85 Iowa, 313 (52 N. W. Rep. 232).

In that case this court quoted, with approval, from cases cited, as follows: "The cardinal principle to be kept in view is that the intent of the testator,

if possible, is to be ascertained in the construction of wills. Courts always look upon the intent of the testator as the polar star to direct them in construction of wills.

The object of all rules of interpretation is to discover the intent, and this should be gathered from the whole instrument.

It may, however, be trusted as a safe rule to follow in all cases of construction of contracts, conveyances, or wills, that the intent of the parties, manifested by the reading of the whole instrument together, in the light of attending circumstances, must control the meaning." It is said in that case: "The intent of the testator, as shown by the will construed according to established rules, must control. Courts may not give effect to any other result than that intended. To do so would be to make the will for the testator. Neither may they defeat the intention when it is lawful."

Guided by these rules, we turn to the will to ascertain the intent of the testator in respect of the devise to Anna Shoup.

It is therein plainly written, in unmistakable terms, that the proceeds of the estate are to be paid to Elizabeth Hormel "so long as she shall remain my widow," and, in terms quite as definite, that, if she marries again, one-half shall be paid to her for her own free use, "and the other half to be paid to my sister, Anna Shoup."

The sole contingency upon which Anna Shoup was to be paid one-half, was the re-marriage of Elizabeth Hormel. Elizabeth Hormel did not marry again, and therefore the contingency upon which alone Anna Shoup was to have one-half of the estate never occurred. Under the facts, viewed from our standpoint, we might say that it would be reasonable and equitable if the testator had provided that one-half

should go to Anna Shoup on the death of the widow without re-marriage, as well as upon her marrying again; but the will does not so provide. The testator had a right to rest it upon the condition that he did, and, having done so, it is not for us to inquire as to his reasons. We think the learned district judge held properly that Anna Shoup is not entitled to take one-half of the estate under the will, and that she is only entitled to share therein as an heir of John C. Hormel, deceased.

II. Elizabeth Hormel was a citizen of the United States, and a resident of the state of Iowa, at the time of her death. In the few months that transpired between the death of her husband and her own death, she had not elected whether she would take under his will or under the statute; but it is not questioned but that she died seized of an undivided half of the real estate in controversy, and that her interest passed to her next of kin legally qualified to inherit the same, immediately upon her death. She died without issue, leaving as her only parent surviving her, her mother, Elizabeth Opel, a non-resident alien, residing in Bavaria, Germany. Elizabeth Opel died, intestate, in Bavaria, on May 12, 1894, leaving, as her next kin, surviving her, her children, John Opel, Sr., and Barbara Degleman, both non-resident aliens, and the plaintiff, Fred Opel, a citizen of the United States, and resident of the state of Iowa.

The plaintiff, Fred Opel, contends that he is entitled to inherit the undivided one-half of said real estate from his sister, Elizabeth Hormel, either solely or with his said brother and sister.

It is contended on behalf of the heirs of John C. Hormel, that neither the plaintiff nor the other children of Elizabeth Opel are entitled to so inherit, and that, therefore, no heirs of Elizabeth Hormel being found legally entitled to inherit said property, it goes

to the heirs of her deceased husband, John C. Hormel, under section 2458 of the Code of Iowa.

Leaving out of consideration the fact of alienage, it would not be questioned but that, upon her death, the estate of Mrs. Hormel vested in her mother, and, upon her death, in her children, Fred Opel, John Opel, Sr., and Barbara Degleman. Chapter 85, Acts Twenty-second General Assembly, approved April 9, 1888, provides as follows:

"Section 1. Non-resident aliens * * * are hereby prohibited from acquiring title to, or taking or holding any lands or real estate in this state by descent, devise, purchase, or otherwise, only as hereinafter provided."

An exception is thereinafter provided in favor of "the widow and heirs of aliens who have heretofore acquired lands in this state under the laws thereof;" but this exception does not apply to this case, as Elizabeth Hormel was not an alien. Section 2 of said chapter provides as follows:

"Sec. 2. Any non-resident alien may acquire and hold real property to the extent of three hundred and twenty (320) acres, or city property to the amount of ten thousand dollars in value, providing that within five years from the date of purchase of said property, the same is placed in the actual possession of a relative of such purchaser, the occupant being related to such owner within the third degree of kindred, or the husband or wife of such relative, and further provided, that such occupant become a naturalized citizen within ten years from the purchase of said property aforesaid."

In *Bennett v. Hibbert*, 88 Iowa, 155 (55 N. W. Rep. 93), it is held that "purchase" and "purchaser," as found in this section, include every method of acquiring title to real estate, except by descent by operation of law. See *Burrow v. Burrow*, 98 Iowa, 400 (67 N. W.

Rep. 287).   Section 7 of said chapter provides that the
act shall not apply to aliens who are residents of the
state of Iowa.   It is certainly clear that Mrs. Opel was
disqualified from acquiring title to, or taking or hold-
ing this real estate by descent, under the prohibitions
of the first section, and that she is not within either of
the exceptions made to that prohibition.

In *Furenes v. Mickelson,* 86 Iowa, 508 (53 N. W.
Rep. 416), this court held that a naturalized citizen,
resident of this state, cannot inherit through a father
who is a non-resident alien, the lands of a great-uncle
who was a naturalized citizen, "on the ground that a
line of inheritance cannot be traced through non-resi-
dent aliens."

If nothing further appeared, the conclusion would
follow from what we have said, that the estate did not
pass to Elizabeth Opel, and consequently, did not pass
to her children.

III.   On January 21, 1845, there was concluded
and adopted between the United States of America
and the King of Bavaria, Germany, a treaty, articles
1, 2, and 3 of which are as follows:

"Article 1.   Every kind of *droit d'aubaine, droit
de retraite,* and *droit de detraction* or tax on emigra-
tion, is hereby and shall remain, abolished between
the two contracting parties, their states, citizens, and
subjects, respectively.

"Art. 2.   Where, on the death of any person hold-
ing real property within the territories of one party,
such real property would, by the laws of the land,
descend on a citizen or subject of the other, were
he not disqualified by alienage, such citizen or
subject shall be allowed a term of two years to sell the
same, which term may be reasonably prolonged accord-
ing to circumstances, and to withdraw the proceeds
thereof, without molestation, and exempt from all
duties of detraction.

"Art. 3.   The citizens or subjects of each of the contracting parties shall have power to dispose of their (real and) personal property within the states of the other, by testament, donation, or otherwise; and their heirs, legatees, and donees, being citizens or subjects of the other contracting party, shall succeed to their said (real and) personal property, and may take possession thereof, either by themselves or by others acting for them; and dispose of the same at their pleasure, paying such duties only as the inhabitants of the country where the said property lies shall be liable to pay in like cases."

The other articles provide for the care of the property in the absence of the heirs, the mode of deciding disputes, that the treaty shall not derogate from the force of laws of Bavaria to prevent the emigration of the king's subjects, and that the treaty is made subject to the approval of the two governments,

This treaty abolishes, as between these governments and the subjects thereof, "every kind of *droit d'aubaine, droit de retraite,* and *droit de detraction* or tax on emigration."

Black's Law Dictionary defines *"droit"* as equivalent to the English word "right"; and *"droit de'aubaine"* as, "in French law, a rule by which all the property of a deceased foreigner, whether movable, or immovable, was confiscated to the use of the state, to the exclusion of his heirs, whether claiming *ab intestato* or under a will of the deceased."   It is this provision of the treaty that we are called upon to consider.   Appellants insist that the provisions of the treaty are not applicable to this case; that confiscation was never applied by any government to property of its own deceased citizens; and that the treaty only contemplates the protection of the citizens of either government, who may die having property in the other.

The fault of this argument is in assuming that the protection is for the dead, and that the property remains in the deceased. It is conceded that this property vested in some living person immediately upon the death of Mrs. Hormel. If, under the common law, that person was disqualified by alienage from inheriting it, then this treaty applies and removes that disqualification.

In the absence of this treaty, Mrs. Opel was disqualified, by alienage, from inheriting this property; but by it the disqualification was removed, and therefore the property descended to her. Our inquiry, then, is as to property in Iowa belonging to a resident and subject of Bavaria.

Appellants cite *Frederickson v. Louisiana*, 23 Howard, 445. "Fink was a naturalized citizen of the United States at the time of his death, and residing in the city of New Orleans; also, that the legatees resided in the kingdom of Wurtemberg, and are subjects of the King of Wurtemberg." We had a treaty with that kingdom similar to that under consideration. Louisiana had a statute providing that "each and every person, not being domiciled in this state, and not being a citizen of any other state or territory in the Union, who shall be entitled, whether as heirs, legatee, or donee, to the whole or any part of the succession of a person deceased, whether such person shall have died in this state, or elsewhere, shall pay a tax of ten per cent. on all sums, or on the value of all property which he may have actually received from said succession, or so much thereof as is situated in this state, after deducting all debts due by the succession." Rev. St. 1876, section 3683. The claim of the state to this tax was resisted, on the ground that it was contrary to the third article of the treaty, and that article alone, and not the second, as in this case, was under consideration. The third article of that treaty relates solely to

personal property, and is different in its language from the second, which is identical with the second in this. The court held that the act does not make any discrimination between citizens of the state and aliens in the same circumstances, and sustained the tax as valid. Appellants quote from the opinion as follows: "But we concur with the supreme court of Louisiana in the opinion that the treaty does not regulate testamentary disposition of citizens or subjects of the contracting powers with reference to property within the country of their origin or citizenship. The cause of the treaty was that the citizens and subjects of each of the contracting powers were or might be subject to onerous taxes upon property possessed by them within the states of the other by reason of their alienage, and it is, perhaps, to enable such citizens to dispose of their property, paying such duty only as the inhabitants of the country where the property lies pay under like conditions. The case of a citizen or subject of the respective countries residing at home, and disposing of property there in favor of a citizen or subject of the other, was not in contemplation of the contracting powers, and is not embraced in this article of the treaty." This view of that treaty is applicable to the one before us, but we fail to see wherein it supports the claim that the facts of this case do not bring it within the provisions of this treaty.

IV. Appellants cite authorities to the effect that the states alone have the right to regulate, by legislation, descents and conveyances of real estate within their borders; and from this it is argued that the federal government has no power, "by treaty, to interfere with the right of the state in regard to the descent of property upon the death of its citizens"; that treaties made without authority are not valid; that this treaty is in conflict with the laws of Iowa, and is, therefore, of no force or effect. It may

be conceded that the states alone have such power; that they alone may declare to what kindred the estate of persons dying intestate shall descend. It must also be conceded that the federal government alone has power to treat with other governments as to rights of the citizens of each within the territory of the other. This treaty does not attempt to regulate descents of real property in Iowa. It does not declare that, when a son or daughter dies without issue, the estate shall go to the parents. It is left to the state, and Iowa has so provided. This treaty simply declares that, if that parent is disqualified by alienage, as to the citizens of these two governments, this disqualification is removed. In Article 6 of the Constitution of the United States, it is provided that "this Constitution, and the laws of the United States which shall be made in pursuance thereof, and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution, or the laws of any state, to the contrary notwithstanding." Many cases may be found wherein the courts have enforced treaty stipulations, similar to this, in favor of foreign claimants; but the case of *People v. Gerke*, 5 Cal. 381, is the first we find wherein the power of the federal government in this respect was questioned. In that case, Deck, a citizen of Prussia, died in San Francisco, leaving undisposed of a large amount of real property in that state. Article 14 of our treaty with Prussia is the same as Article 3 of this treaty. The attorney general, on behalf of the state, denied the power of the federal government to make such a provision by treaty, and argued, as is done in this case, that to exercise such power would permit the federal government to control the internal policy of the states, and in cases like this to alter materially the statutes of descent.

The court, after an able consideration of the subject, concludes as follows: "I can see no danger which can result from yielding to the federal government the full extent of powers which it may claim from the plain language, intent, and meaning of the grant under consideration. Upon some subjects the policy of a state government, as shown by her legislation, is dependent upon the policy of foreign governments, and would be readily changed upon the principle of mutual concession. This can only be effected by the action of that branch of the state sovereignty known as the 'General Government;' and, when effected, the state policy must give way to that adopted by the governmental agent of her foreign relations." The reasoning and conclusion of the opinion are strongly emphasized by what is added by Justice Ryan. While the question of the power of the federal government in this respect was not directly passed upon in the following cases, they show that the courts have uniformly enforced such treaties, without doubting the power of the federal government to make them: *Chirac v. Chirac,* 2 Wheaton, 259; *Hauenstein v. Lynham,* 100 U. S. 483; *Geofroy v. Riggs,* 133 U. S. 258 (10 Sup. Ct. Rep. 295); *Fairfax v. Hunter,* 7 Cranch, 603; *Carneal v. Banks,* 10 Wheaton, 189; *Hughes v. Edwards,* 9 Wheaton, 489. In the recent case of *Wunderle v. Wunderle,* 144 Ill. 40 (33 N. E. Rep. 195), the subject of descents and alienage is considered at length, and with marked care and ability, as affected by the common law, and by statutes of the states and by treaties with the United States. In considering the effect of conflict between the statute of the state and a treaty with the United States, the court, after citing article 6 of the federal constitution, says: "In construing this article, it has been held that provisions in regard to the transfer, devise, or inheritance of property are fitting subjects of negotiation and regulation

by the treaty-making power of the United States, and that a treaty will control or suspend the statutes of the individual states whenever it differs from them. Hence, if the citizen or subject of a foreign government is disqualified under the laws of a state from taking, holding, or transferring real property, such disqualification will be removed, if a treaty between the United States and such foreign government confers the right to take, hold, or transfer real property." If it may be said that chapter 85 of the Acts of the Twenty-second General Assembly is in conflict with said treaty of January 21, 1845, reason and the authorities support the conclusion that the treaty must control.

It follows from the conclusions we have reached that an undivided one-half of the property in question vested in Mrs. Opel upon the death of her daughter, and upon her death it passed to her children, subject to the conditions imposed by said treaty, and that the other undivided one-half passed to the heirs of John C. Hormel, deceased. The decree of the district court being in harmony with these conclusions, it is AFFIRMED.