[No. 8424.   *En Banc.*   May 14, 1910.]

# In the Matter of the Estate of PEDER G. STIXRUD, *Deceased,* JOHAN E. STIXRUD *et al., Appellants,* v. THE STATE OF WASHINGTON, *Respondent.*[1]

TREATIES—STATE LAWS—CONFLICT OF LAWS. State laws in conflict with treaties between the United States and foreign countries are held in abeyance during the existence of the treaty.

TREATIES—ALIENS—DISABILITIES. The removal of disabilities of aliens as to the acquisition of property in the several states is a proper subject of treaty between the United States and foreign countries.

TREATIES—CONSTRUCTION—"RESPECTIVE." A treaty providing that the subjects of the contracting parties "in the respective states" may freely dispose of their property, means that the subject may freely dispose of his property within the country of his citizenship; "respective" meaning "pertaining or relating severally to each of those under consideration."

SAME—ALIENS—DESCENT AND DISTRIBUTION—SUCCESSION UNDER TREATY—CONSTRUCTION. The treaty between Norway and Sweden and the United States, providing that the subjects of the contracting parties in the respective states may freely dispose of their goods and effects by testament or otherwise and that their heirs in whatever place they shall reside shall receive the succession, etc., entitles aliens residing in Sweden to take property devised to them by a naturalized citizen of the United States; especially in view of the rule of liberal construction applicable to treaty rights.

SAME—INHERITANCE TAX—RIGHTS OF ALIENS—STATUTES—VALIDITY. Rem & Bal. Code, § 9183, providing for an inheritance tax of twenty-five per cent on all sums passing to collateral relatives who are aliens not residing in the United States, which exceeds the tax upon relatives who are citizens of the United States, violates the treaty between Norway and Sweden and the United States, which provides that the subjects of the contracting parties may freely dispose of their goods and effects by testament and that their heirs in whatever place they shall reside shall receive the succession, exempt from all duty called "droit de detraction" on the part of the government of the two states respectively; since an inheritance tax is an impost or excise on the right to pass the estate and not a tax upon

[1]Reported in 109 Pac. 343.

the property, and the treaty was intended to secure to aliens the right to succeed to property upon the same terms provided by general laws for our own citizens.

TREATIES—CONSTRUCTION—"GOODS AND EFFECTS." A treaty securing to aliens the right to succeed to "goods and effects" embraces real property.

TREATIES—CONSTRUCTION—HEIRS. The treaty between Norway and Sweden and the United States, securing to alien "heirs" the right to "receive the succession" to property, covers the right of succession by testament as well as by operation of law.

FULLERTON and GOSE, JJ., dissenting.

Appeal from an order of the superior court for Thurston county, Mitchell, J., entered May 17, 1908, directing the payment of an inheritance tax by the devisees of a will, upon the final settlement of an estate. Reversed.

*S. S. Langland* and *Bausman & Kelleher*, for appellants.

*J. E. Frost* and *T. D. Rockwell*, for respondent.

PARKER, J.—Peder G. Stixrud, a naturalized citizen of the United States and a resident of this state, died at Olympia in January, 1908. He left a will by which he devised all of his property both real and personal to his brother and sister, Johan E. Stixrud and Petronella Stixrud, who were then residents and citizens of Norway. In February, 1908, letters of administration with the will annexed were granted upon the estate of Peder G. Stixrud, and upon the settlement of the estate it was determined by the superior court for Thurston county that the portion of the estate passing to the devisees under the will, after payment of debts and expenses of administration, was subject to an inheritance tax of twenty-five per cent. An order was entered accordingly, directing payment of such inheritance tax computed at this rate. From this order the devisees, Johan E. Stixrud and Petronella Stixrud, have appealed.

The law fixing the amount of the inheritance tax upon property passing by will or inheritance is § 2, Laws 1907,

p. 500 (Rem. & Bal. Code, § 9183), and so far as necessary for us to notice, is as follows:

"The inheritance tax shall be and is to be levied on all estates subject to the operation of this chapter on all sums above the first ten thousand dollars, where the same shall pass to or for the use of the father, mother, husband, wife, lineal descendant, adopted child, or the lineal descendant of an adopted child, one (1) per centum. On all sums not exceeding the first fifty thousand dollars, of three per centum, where such estate passes to collateral heirs to and including the third degree of relationship, . . . Provided, that on all sums passing to or for the benefit of collateral relatives or strangers of the blood, who are aliens not residing in the United States, a tax of twenty-five per centum shall be levied and collected."

Appellants being collateral heirs of the deceased within the third degree of relationship, it is plain that the inheritance tax upon the property they take under this will would only be three per cent, since the amount thereof is less than $50,000, unless the rate of the tax is controlled by the proviso fixing the rate at 25 per cent where property passes to collateral relatives who are aliens not residing in the United States.

Learned counsel for appellants contend that the property left to them by their deceased brother is liable to pay an inheritance tax of only three per cent, the same as if they were not aliens residing out of the United States at the time of their brother's death, by virtue of article 6 of the Treaty of Amity and Commerce of 1783 as revived by article 17 of the Treaty of Commerce of Navigation of 1827, still existing between Norway and Sweden and the United States, which provides:

"The subjects of the contracting parties in the respective states may freely dispose of their goods and effects either by testament, donation or otherwise, in favor of such persons as they think proper; and their heirs in whatever place they shall reside, shall receive the succession even *ab intestato* either in person or by their attorney without having occasion

to take out letters of naturalization.    These inheritances as well as the capitals and effects which the subjects of the two parties in changing their dwelling, shall be desirous of removing from the place of their abode, shall be exempt from all duty called 'droit de detraction' on the part of the government of the two states respectively.    But it is at the same time agreed, that nothing contained in this article shall in any manner derogate from the ordinances published, in Sweden against immigration, or which may hereafter be published, which shall remain in full force and vigor. The United States on their part, or any of them shall be at liberty to make respecting this matter, such laws as they think proper." 7 Fed. Stats. Ann., pp. 828, 835.

By the second clause of article 6 of the constitution of the United States it is declared:

"This constitution, and the laws of the United States which shall be made in pursuance thereof, and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the constitution or laws of any state to the contrary notwithstanding."

It has become the settled law of this country that when a law of a state comes in conflict with the provisions of a treaty, entered into by the United States with a foreign country relating to a subject-matter within the treaty-making power, such law must give way, and its application to the subject-matter covered by the treaty held in abeyance during the existence of the treaty.    In *Hauenstein v. Lynham,* 100 U. S. 483, 490, Justice Swayne, speaking for the court, said:

"It must always be borne in mind that the constitution, laws, and treaties of the United States are as much a part of the law of every state as its own local laws and constitution.    This is a fundamental principle in our system of complex national polity. See, also, *Shanks v. Dupont,* 3 Pet. 242; *Foster & Elam v. Neilson,* 2 id. 253; *The Cherokee Tobacco,* 11 Wall. 616; Mr. Pinkney's Speech, 3 Elliot's Constitu-

tional Debates, 231; *The People, etc. v. Gerke & Clark*, 5 Cal. 381."

It is equally well settled that the matter of removing the disability of aliens, in order that they may have the same rights as citizens to acquire and hold property in the states of the Union, is a proper subject of treaty regulation. Justice Field, in speaking for the supreme court of the United States in *Geofroy v. Riggs*, 133 U. S. 258, 266, said:

"That the treaty power of the United States extends to all proper subjects of negotiation between our government and the governments of other nations, is clear. It is also clear that the protection which should be afforded to the citizens of one country owning property in another, and the manner in which that property may be transferred, devised or inherited, are fitting subjects for such negotiation and of regulation by mutual stipulations between the two countries."

The state courts, at the present day, have uniformly given their assent to this doctrine. *Blythe v. Hinckley*, 127 Cal. 431, 59 Pac. 787; *Dockstader v. Kershaw*, 4 Penn. (Del.) 398; *Wunderle v. Wunderle*, 144 Ill. 40, 33 N. E. 195, 19 L. R. A. 84; *Opel v. Shoup*, 100 Iowa 407, 69 N. W. 560, 37 L. R. A. 583; *Yeaker's Heirs v. Yeaker's Heirs*, 4 Met. (Ky.) 33, 81 Am. Dec. 530; *Baker v. Shy*, 9 Heisk (Tenn.) 85; *Succession of Rabasse*, 47 La. Ann. 1452, 17 South. 867, 49 Am. St. 433; *Kull v. Kull*, 37 Hun 476.

These firmly established principles are not denied by learned counsel for the state, but they contend that there is nothing in this treaty to prevent a sovereign state of the Union from collecting an inheritance tax from alien heirs or devisees of a citizen of the United States, upon property in the United States; that this article was adopted for the protection of the citizens of Sweden and Norway residing in the United States and citizens of the United States residing in Sweden and Norway; that it does not seem possible

that our government would think it necessary to make a
treaty with a foreign country for the protection and benefit
of a citizen's property at home, he being protected and sub-
ject only to the laws of his country.  These contentions are
apparently based on the theory that the paramount con-
sideration in the interpretation of this treaty is the right of
the deceased to dispose of his property by testament or have
it pass by descent to his heirs, rather than the right of his
heirs to receive the succession.  In other words, the argu-
ment seems to be that the treaty is designed to protect the
rights of the deceased, rather than those who take from
him; and hence, can have no application to the property of a
deceased citizen passing to a citizen of the other country.
Of course one country would not be interested in the succes-
sion of property merely between citizens of the other; but
it would be interested in the succession of property passing
from a citizen of one country to citizens of the other, and
clearly the power to dispose of property by testament by a
citizen of the country where he resides and where his prop-
erty is situated would effect the right of his devisee, a citizen
of the other country, to receive such property.  Under the
same circumstances would each country be interested in the
right of its citizens to inherit from citizens of the other.

The principle authority relied upon by learned counsel in
support of this argument is the case of *Frederickson v.
Louisiana*, 23 How. 445.  That case was brought into the
supreme court of the United States from the supreme court
of Louisiana by writ of error.  There was involved a ten per
cent inheritance tax levied by the state upon so much of the
property of a deceased naturalized citizen of the United
States, residing at the time of his death in Louisiana, as
passed by his will to residents and subjects of the Kingdom
of Wurtemberg.  The statute under which the state claimed
the tax, the treaty provisions relied upon by the legatees to
avoid the tax, and the court's views touching their rights,

will be best understood by the following quotation from the decision, commencing on page 446:

"By a statute of Louisiana, it is provided that 'each and every person, not being domiciliated in this state, and not being a citizen of any other state or territory in the Union, who shall be entitled, whether as heirs, legatee, or donee, to the whole or any part of the succession of a person deceased, whether such person shall have died in this state, or elsewhere, shall pay a tax of ten per cent on all sums, or on the value of all property which he may have actually received from said succession, or so much thereof as is situated in this state, after deducting all debts due by the succession.' The claim of the state of Louisiana was resisted in the District Court, on the ground that it is contrary to the provisions of the third article of the convention between the United States of America and his Majesty the King of Wurtemberg, of the 10th April, 1844. That article is, that 'The citizens or subjects of each of the contracting parties shall have power to dispose of their personal property within the states of the other, by testament, donation, or otherwise; and their heirs, legatees, and donees, being citizens or subjects of the other contracting party, shall succeed to their said personal property, and may take possession thereof, either by themselves or by others acting for them, and dispose of the same at their pleasure, paying such duties only as the inhabitants of the country where the said property lies shall be liable to pay in like cases.' This court, in *Mager v. Grima*, 8 How. S. C. R., 490, decided that the act of the legislature of Louisiana was nothing more than the exercise of the power which every state or sovereignty possesses of regulating the manner and terms upon which property, real and personal, within its dominion, may be transmitted by last will and testament, or by inheritance, and of prescribing who shall and who shall not be capable of taking it. The case before the district court in Louisiana concerned the distribution of the succession of a citizen of that state, and of property situated there. The act of the legislature under review does not make any discrimination between citizens of the state and aliens in the same circumstances. A citizen of Louisiana domiciliated abroad is subject to this tax. *The State v. Poydras*, 9 La. Ann. R., 165; therefore, if this article of the treaty comprised the succession of a citizen of

Louisiana, the complaint of the foreign legatees would not be justified. They are subject to 'only such duties as are exacted from citizens of Louisiana under the same circumstances.' But we concur with the supreme court of Louisiana in the opinion that the treaty does not regulate the testamentary dispositions of citizens or subjects of the contracting powers, in reference to property within the country of their origin or citizenship. The cause of the treaty was, that the citizens and subjects of each of the contracting powers were or might be subject to onerous taxes upon property possessed by them within the states of the other, by reason of their alienage, and its purpose was to enable such persons to dispose of their property, paying such duties only as the inhabitants of the country where the property lies pay under like conditions. The case of a citizen or subject of the respective countries residing at home, and disposing of property there in favor of a citizen or subject of the other, was not in the contemplation of the contracting powers, and is not embraced in this article of the treaty."

There are two important particulars in which that case differs from the one before us. *First*, the treaty there involved provided that, "The citizens or subjects of each of the contracting parties shall have power to dispose of their personal property *within the states of the other* by testament," etc., while the treaty here involved provides that "The subjects of the contracting parties *in the respective states* may freely dispose of their goods and effects by testament," etc. *Second*, the statute of Louisiana, there involved, did not make any discrimination between the citizens of the state and aliens in the same circumstances. A citizen of Louisiana domiciled abroad was subject to the tax. The statute here involved imposes a tax of twenty-five per cent on property passing to collateral relatives who are aliens not residing in the United States, and at the same time imposes a tax of only three per cent on property passing to citizens under the same circumstances; thus clearly discriminating between citizens residing abroad and aliens residing abroad. The persons who may freely dispose of their goods and

effects under this treaty are the subjects of the contracting parties "In the respective states." Clearly, these words must at least mean that the subject may freely dispose of his property by testament within the country of his citizenship. The word "respective" is defined by the Standard Dictionary as, "pertaining or relating severally to each of those under consideration; several; particular; as, they went to their respective homes." The more strictly we construe this language, the more certain does it seem applicable to the facts in this case, in favor of the rights claimed by appellants, as against the contention of the state based upon the fact that the deceased was a citizen of the United States.

Turning now to the right of appellants to receive the succession, if, indeed, such right can be considered in this case apart from the right of the deceased to give "by testament," we find the express terms of the treaty not only guaranteeing to them the right to receive, but guaranteeing to them in so many words, the right to receive "In whatever place they shall reside." And then, apparently for the purpose of removing all possible doubt as to the effect of their want of citizenship in the country in which the property may be situated, upon their right to receive, the treaty further expressly provides that they shall receive "without having any occasion to take out letters of naturalization." Thus indicating an intention to give them the same right to receive as if they were citizens.

In the case of *Schultze v. Schultze*, 144 Ill. 290, 33 N. E. 201, 36 Am. St. 432, 19 L. R. A. 90, the court had under consideration article 7 of the treaty of 1827 between the United States and Bremen, providing as follows:

"The citizens of each of the contracting parties shall have power to dispose of their personal goods, within the jurisdiction of the other, by sale, donation, testament, or otherwise; and their representatives, being citizens of the other party, shall succeed to their said personal goods, whether by testament or *ab intestato*, and they may take possession thereof, either by themselves or others acting for them, and

dispose of the same at their will, paying such dues only as the inhabitants of the country, wherein said goods are, shall be subject to pay in like cases; and if, in the case of real estate, the said heirs would be prevented from entering into the possession of the inheritance on account of their character of aliens, there shall be granted to them the term of three years to dispose of the same, as they think proper, and to withdraw the proceeds without molestation and exempt from all duties of detraction on the part of the governments of the respective states."

Referring to the right of alien heirs and representatives of citizens of the United States under this treaty provision, Justice Magruder, speaking for the court, said:

"The second clause can be construed to mean, that the representatives or heirs of American citizens being citizens of Bremen shall succeed to personal goods. It follows that, by the terms of the third clause, the heirs of American citizens who are citizens of Bremen shall have the prescribed term of three years to dispose of real estate, etc. The appellees are, therefore, entitled, under said article 7 of the treaty, to the privilege of selling the interests in the land in controversy, which they would have inherited from the deceased George Ludwig Schultze under the laws of Illinois but for their alienage, and of removing such proceeds of sale, providing they do so within three years."

It seems to us that the terms of that treaty are not as clear in securing rights to alien heirs of citizens of the United States as the treaty involved in the case before us; yet, the liberal rule of construction applicable to treaty rights induced the court in that case to regard the United States citizenship of the deceased as having no effect upon the rights of his alien representatives to succeed to property left by him in this country. The following authorities, involving aliens taking by will or inheritance from citizens of the United States, may be cited as lending additional support to this view, though the right to take does not appear to have been challenged upon the ground of the citizenship of the deceased. *Jost v. Jost*, 1 Mackey (D. C.) 487; *Geofroy v.*

*Riggs, Kull v. Kull,* and *Opel v. Shoup, supra; Adams v.
Akerlund,* 168 Ill. 632, 48 N. E. 454.

In the case last cited, the court held that subjects and resi-
dents of Sweden, who were heirs of a citizen of the United
States residing in Illinois at the time of his death, inherited
property of the deceased situated in Illinois, by virtue of the
terms of the same treaty which is here involved. We are
lead to conclude that the rights of appellants here claimed
are in no way affected by the mere fact that their deceased
brother was, at the time of his death, a citizen of the United
States, and that the property claimed is in the state of Wash-
ington.

We are next confronted with the question, Does this charge
of twenty-five per cent as an inheritance tax upon the prop-
erty passing to appellants under this will impair the rights
guaranteed to them by the terms of this treaty? A tax of
this nature is not a tax upon property, but is a charge upon
the right or privilege of receiving it. The nature of this tax
and the legal basis for its support is well stated by Justice
Brown, speaking for the supreme court of the United States
in *United States v. Perkins,* 163 U. S. 625, 628, as follows:

"Though the general consent of the most enlightened na-
tions has, from the earliest historical period, recognized a
natural right in children to inherit the property of their
parents, we know of no legal principle to prevent the legisla-
ture from taking away or limiting the right of testamentary
disposition or imposing such conditions upon its exercise as
it may deem conducive to public good.

"In this view, the so called inheritance tax of the State of
New York is in reality a limitation upon the power of a tes-
tator to bequeath his property to whom he pleases; a declara-
tion that, in the exercise of that power, he shall contribute
a certain percentage to the public use; in other words, that
the right to dispose of his property by will shall remain,
but subject to a condition that the state has a right to
impose. Certainly, if it be true that the right of testa-
mentary disposition is purely statutory, the state has a
right to require a contribution to the public treasury be-
fore the bequest shall take effect. Thus the tax is not upon

the property, in the ordinary sense of the term, but upon the right to dispose of it, and it is not until it has yielded its contribution to the state that it becomes the property of the legatee. This was the view taken of a similar tax by the Court of Appeals of Maryland in *State v. Dalrymple*, 70 Maryland, 294, 299, in which the court observed: 'Possessing, then, the plenary power indicated, it necessarily follows that the state in allowing property . . . to be disposed of by will, and in designating who shall take such property where there is no will, may prescribe such conditions, not in conflict with or forbidden by the organic law, as the legislature may deem expedient. These conditions, subject to the limitation named, are, consequently, wholly within the discretion of the General Assembly. The act we are now considering plainly intended to require that a person taking the benefit of a civil right secured to him under our laws should pay a certain premium for its enjoyment. In other words, one of the conditions upon which strangers and collateral kindred may acquire a decedent's property, which is subject to the dominion of our laws, is, that there shall be paid out of such property a tax of two and a half per cent into the treasury of the state. This, therefore, is not a tax upon the property itself, but is merely the price exacted by the state for the privilege accorded in permitting property so situated to be transferred by will or by descent or distribution.' "

This view of the nature of an inheritance tax has been recognized by this court in *State v. Clark*, 30 Wash. 439, 71 Pac. 20, where at page 445, it was said by Chief Justice Reavis: "It is an impost or excise on the right to pass the estate and the privilege of the devisee to take." *Plumber v. Coler*, 178 U. S. 115, 125; *State v. Hamlin*, 86 Me. 495, 30 Atl. 76, 41 Am. St. 569, 25 L. R. A. 632; *State ex rel. Gelsthorpe v. Furnell*, 20 Mont. 299, 51 Pac. 267, 39 L. R. A. 170; *In re Macky's Estate*, 46 Colo. 79, 102 Pac. 1075, 23 L. R. A. (N. S.) 1207.

It is upon this theory that such a tax is held not to be in violation of the usual constitutional provisions requiring uniformity of taxation upon property. It is, therefore, apparent that the levy of a tax of this nature has the direct effect of impairing the right or privilege of receiving prop-

erty by testament or inheritance; and in that manner this
tax impairs the right of these appellants to take, since it
withholds from them twenty-five per cent of the property they
would be entitled to were they citizens of the United States
and this law did not exist. It logically follows that they are
deprived of a right accorded them by the terms of this treaty,
unless it can be said that this tax does not deprive them of
their treaty rights because it is an exercise of the power of
taxation by a sovereign state, and that the treaty contem-
plates the exercise of such power by each of the contracting
parties.

It may be conceded that there is no limit to the taxing
power of the sovereign, and that the right or privilege of
succession to property upon the death of its owner may be
given or withheld by the state at its pleasure. Indeed, the
concluding words of article 6 of this treaty, probably with
unnecessary caution, reserves to the United States and each of
them the "liberty to make, respecting the matter, such laws
as they think proper." But surely this power cannot be
rightfully exercised in such manner as to destroy the very
rights the treaty was plainly designed to secure. It, of
course, cannot be seriously contended that citizens of Sweden
and Norway are, by the terms of this treaty, accorded any
greater rights in their succession to property than the general
laws of the states of the Union may accord to citizens of the
United States. The laws of the several states would un-
doubtedly control those rights even though no reservation to
that effect was in the treaty. To whatever extent the right
or privilege of a citizen of the United States to take prop-
erty by testament or inheritance is impaired by our own
laws, whether such laws relate to taxation or succession, to
that extent will the rights of the citizens of Norway and
Sweden be impaired without violating the terms or spirit of
this treaty.

The language of the treaty giving the citizens of the con-
tracting parties the right to dispose of their goods and

effects by testament, and the right to receive the succession, must mean the right to so give and receive as such right may be defined by the general laws in force in the country where the property is situated. It could not mean otherwise, because there is no law to which we may turn, or which the contracting parties could have in view, in the making of the treaty, defining testamentary and succession rights, save the laws of the respective countries. There is no universal or international law of succession to property. In order then to give force and effect to the treaty, and avoid the destruction of the very end it was plainly intended to accomplish, we must conclude that the testamentary and inheritance rights secured thereby are such that they cannot be impaired, except as such rights and privileges of citizens may be impaired by the laws of their own country. The enforcement of a law which would have the effect of burdening the succession of property passing to the citizens of Sweden and Norway, greater than that imposed upon property passing to our own citizens, would, in our opinion, be a plain violation of the rights secured by this treaty. The treaty must be held to mean that so far as the right of succession to property from deceased persons is concerned, the citizens of each country stand on an equal footing. Otherwise its evident intent and purpose, touching the matters here involved, might be rendered of no effect by the passage and enforcement of laws discriminating against citizens of other countries, under the guise of exercising the taxing power or the power to control the succession of property. If these appellants can be discriminated against by withholding from them in the form of taxation a larger portion of the property left them than can be withheld from others under the same circumstances, then, by the same method of discrimination, their right of succession to the property may be entirely destroyed, by taking all of it; even though others may not have their privilege of succession thus impaired in the least. We think this treaty was intended to secure, and does secure, to the citizens

of Sweden and Norway the right to succeed to property left them by will or inheritance, upon the same terms as such rights of our own citizens may be defined by law. These are the rights, and the law defining them, which must have been in view in the making of the treaty, rather than possible discriminating laws affecting the rights of aliens different from citizens; for to concede the right to make and enforce such laws is to concede the right to nullify the provisions of the treaty. This construction of the terms of the treaty finds additional support when we call to our aid the general rule of liberal construction applied by the courts, both state and Federal, in such cases. In *Geofroy v. Riggs, supra*, at page 271, Justice Field said:

"It is a general principle of construction with respect to treaties that they shall be liberally construed, so as to carry out the apparent intention of the parties to secure equality and reciprocity between them. As they are contracts between independent nations, in their construction words are to be taken in their ordinary meaning, as understood in the public law of nations, and not in any artificial or special sense impressed upon them by local law, unless such restricted sense is clearly intended. And it has been held by this court that where a treaty admits of two constructions, one restrictive of rights that may be claimed under it and the other favorable to them, the latter is to be preferred. *Hauenstein v. Lynham*, 100 U. S. 483, 487."

See, also, 28 Am. & Eng. Ency. Law (2d ed.), 490; Devlin, Treaty Power, §§ 116, 125.

It has been noticed that the deceased left by his will to these appellants both real and personal property. The use of the words "goods and effects" only, to designate the property the treaty is applicable to, might give rise to argument as to whether or not these words include real property. In the case of *Adams v. Akerlund, supra*, these words in this same treaty were under consideration, where it was contended that real property was not included by them. The court, however, in a very able and exhaustive opinion,

held that real property was included. 1 Bouvier's Law Dictionary (Rawle's Rev.), 635; *University v. Miller*, 3 Dev. (N. C.) 188. No contention is here made upon this point; but in view of the fact that we are here dealing with real as well as personal property, and our decision necessarily has the effect of applying the treaty provision to real as well as to personal property, we deem it not out of place to notice this possible contention.

We have made particular reference to the language of the treaty relating to the rights of those who may receive. It will be noticed that they are described therein by the word "heirs." This word, of course, has its technical common law meaning, restricting it to those who take by inheritance only; while in the civil law it applies to all persons who are called to the succession, whether by the act of the party or by operation of law. 1 Bouvier's Law Dictionary (Rawle's Rev.), 941. There does not appear to be any reason for here attributing to it the technical meaning of either of these systems of law in preference to the other, since it is here used by countries in one of which the common law prevails, and in the other of which the civil law prevails. 1 Bouvier's Law Dictionary (Rawle's Rev.), 330, 370. We are of the opinion that the words, "their heirs . . . shall receive the succession," refers to the right of succession of those who receive by testament as well as those who receive by operation of law, in view of the other provision of the article, and that the effect of the word "heirs" should not be measured by any technical rules. *Geofroy v. Riggs*, *supra*; 21 Cyc. 420; *In re White's Estate*, 42 Wash. 360, 84 Pac. 831. We notice this matter of the meaning of the word "heirs" because of the particular provisions of the treaty defining the rights of those so designated.

The contention of learned counsel for appellants that this inheritance tax is unconstitutional in so far as it imposes upon aliens not residing in the United States a greater tax than upon citizens, in view of certain provisions of our state

constitution, presents a question which does not require our attention at this time. We are of the opinion that article 6 of the treaty before us, secures to appellants the right of succession to the property left them by the will of their deceased brother, upon the same terms as are accorded to our own citizens; and in so far as the law burdens them with a greater tax than it does our own citizens, it must be held in abeyance and yield to the provisions of this treaty.

We conclude that the order of the superior court should be reversed, with instructions to fix the amount of the inheritance tax at a rate not inconsistent with the views herein expressed. It is so ordered.

RUDKIN, C. J., DUNBAR, CHADWICK, CROW, MORRIS, and MOUNT, JJ., concur.

FULLERTON and GOSE, JJ., dissent.