(Nos. 24183, 24184, 24185, 24186.— )
JULIUS BULLMAN *et al.* Appellees, *vs.* THE CITY OF CHI-
CAGO *et al.* Appellants.—THE DELCO TIRE CORPORATION
*et al.* Appellees, *vs.* THE CITY OF CHICAGO *et al.* Ap-
pellants.—THE PACKARD MOTOR CAR COMPANY OF CHI-
CAGO *et al.* Appellees, *vs.* THE CITY OF CHICAGO *et al.*
Appellants.—THE FISK TIRE SERVICE, INC. *et al.* Ap-
pellees, *vs.* THE CITY OF CHICAGO *et al.* Appellants.

*Opinion filed October 22, 1937.*

ORR and WILSON, JJ., dissenting.

BARNET HODES, Corporation Counsel, (MARTIN H. FOSS, and ALPHONSE CERZA, of counsel,) for appellants.

BENJAMIN E. COHEN, and SAMUEL BERKE, (MAYER GOLDBERG, of counsel,) for appellees Julius Bullman *et al.;* SAMUEL ARTHUR KARLIN, (ARNOLD A. ROSEN, of counsel,) for appellees The Delco Tire Corporation *et al.;* SIMS & STRANSKY, (FRANKLIN J. STRANSKY, and SEYMOUR M. LEWIS, of counsel,) for appellees The Packard Motor Car Company of Chicago *et al.;* SEYMOUR M. LEWIS, and NORVAL P. TRIMBORN, for appellees The Fisk Tire Service, Inc., *et al.*

Mr. JUSTICE SHAW delivered the opinion of the court:

These consolidated cases are direct appeals from decrees of the circuit court of Cook county declaring the second-hand dealers license ordinance of the city of Chicago unconstitutional and invalid as to plaintiffs, and permanently enjoining its enforcement.

Complaints were filed by a number of Chicago concerns who allege that they are engaged in various businesses sought to be licensed and regulated by this ordinance. Some of the plaintiffs are engaged in the business of dismantling new and used automobiles, in the purchase of used automobiles, of new and old models, and the dismantling of the same to obtain parts; also, in the sale, at retail, of new and used automobile parts, accessories and tires, and sometimes, as a necessary incident to their business, in the purchase and re-sale of used motor vehicles. Others of the plaintiffs are engaged in the business of selling new automobile supplies and accessories purchased directly from the manufacturers or wholesale distributors, including automobile tires, parts and accessories, and are also engaged either in the manufacture and sale of automobile tires known as "retreads" or re-treaded tires, or in the business of manufacturing and selling automobile tires known as "vulcanized"

tires, purchasing discarded tires in large quantities from dealers, or taking them in trade for re-treaded tires. These plaintiffs allege that the cost of the discarded tires is a small part of the cost of their finished product; that the purchase and use of discarded tires is but an incidental part of the business; that in the manufacture or processes of re-treading tires, expensive machinery, tools and equipment are required and used; that this work involves the purchase and use of quantities of new rubber and raw materials; that re-treaded tires are produced by the use of skilled labor, moulds and machinery and by the use of new rubber and processes substantially the same as those used in the production of new tires by new tire manufacturers; that, in vulcanizing tires, there is involved the use of vulcanizing machinery, tools and equipment, the purchase and the use of new rubber and cement and the employment of skilled workmen; that the purchases of discarded tires, in some instances, amount to as many as one hundred thousand discarded tires a year for one plaintiff, and they are not purchased from individuals.

Certain of the plaintiffs are engaged in the business of selling new motor vehicles or trailers, or both, either purchasing such vehicles from the manufacturers or selling agents for the manufacturers, and, as a necessary incident to their business, they accept used motor vehicles or trailers in trade, which used vehicles are afterwards sold by them; in such business they do not purchase used or second-hand vehicles or deal in them except in connection with and as a necessary and incidental part of their business of selling and disposing of new vehicles. These plaintiffs allege that all, or nearly all, of them own or lease from other persons, and maintain large and attractive show rooms located on some of the most important public streets in the city of Chicago in which they display, in an attractive manner, their new motor vehicles or trailers, or both, to the general public, and in which they transact their several businesses.

Other plaintiffs are engaged in the business of selling new tires, either manufacturing the same, or purchasing them from the manufacturers of tires, or act as distributors for the manufacturers of such new tires, or act as selling agents of said manufacturers, or act as agent of distributors of such new tires. As a necessary incident to the business of selling and disposing of new tires, they sometimes accept used tires in trade as a part payment on the purchase price of new tires, which used tires are afterwards sold. They do not purchase or deal in used or second-hand tires except in connection with and as a necessary and incidental part of the business of selling and disposing of new tires.

The complaints set forth the ordinance of Chicago, licensing and regulating second-hand dealers. It defines a second-hand dealer to mean any person, firm or corporation other than a licensed pawn broker having a place of business in the city for purchasing, trading or dealing in any second-hand article whatsoever. The ordinance requires any person, firm or corporation engaged in the business of second-hand dealer first to obtain a license therefor, and requires a separate license for each location, place or premises used for the business of second-hand dealer. Application for license is required to be in writing, to be investigated by the commissioner of police to determine whether the applicant has complied with the State laws and city ordinances relating to the business and whether the applicant is of good character and reputation. In the case of application for a Class 1 license, the approval of the commissioner of buildings is further required, together with the furnishing of a survey plat of the entire premises to be occupied. The annual license fee to be paid under the ordinance is based upon the kind of second-hand articles handled or dealt with. There are five different classes, with annual fees ranging from $50 to $250. The ordinance requires that every second-hand dealer shall keep a record, in English, of every article received, purchased, sold or ex-

changed by him, setting forth the name, age, sex, residence and general description of the individual with whom the transaction is had, the price or consideration paid or received, the time of the transaction and description of every article received and purchased, sold or exchanged, and requires that every second-hand dealer make out and deliver to the commissioner of police every day except Sunday, before twelve o'clock noon, a copy of such record for the preceding day, such record and all articles received to be open to the inspection of the mayor, alderman and any member of the police force or any person authorized by the commissioner of police. Under the ordinance no second-hand dealer shall deal in any motor vehicle, trailer, tire or motor vehicle accessory or part from or on which any identification numbers have been removed, obliterated, defaced or changed. Certain articles, including watches, motor vehicles and trailers, are required to be held by the dealer for inspection for a period of ten days after report thereof has been made, before the same can be dismantled, unless clearance is given by the commissioner of police in a shorter time. The ordinance also requires that every second-hand dealer shall maintain and display in a conspicuous place at the public entrance of the licensed premises a sign in letters not less than six inches in height, bearing the name of the licensee and the words "Second-hand dealer."

Motions to dismiss the several complaints were filed by the defendants; the motions were denied and the several decrees were entered in accordance with the prayers for relief. The validity of an ordinance being directly involved, the trial court so certified in each case, and, in the several certificates, stated that the public interest required that a direct appeal be taken to this court.

It is contended on behalf of the plaintiffs that the ordinance is invalid for the reason that the city of Chicago has no power to license or regulate their various businesses, which power is claimed by the city under section 95 of

article 5 of the Cities and Villages act. This section authorized the city: "To tax, license, regulate and direct the location of all places of business of purchasers, traders and dealers in junk, rags and any second-hand article whatsoever, and to forbid any person from purchasing or receiving from minors without the written consent of their parents or guardians, any article whatsoever." It was passed in its present form by the General Assembly at the 1935 regular session. Prior to that time the section read as follows: "To tax, license and regulate second-hand and junk stores and yards, and to forbid their purchasing or receiving from minors without the written consent of their parents or guardians, any article whatsoever, and to direct the location thereof." Prior to its amendment, this section of the Cities and Villages act was twice considered by this court. *City of Chicago* v. *Moore,* 351 Ill. 510, and *City of Chicago* v. *Northern Paper Stock Co.* 337 id. 194.

In *City of Chicago* v. *Moore, supra,* the defendant, who conducted a book store in the city of Chicago in which new and second-hand magazines and books were sold, was charged with conducting and operating a second-hand store without having obtained a license so to do, in violation of a municipal ordinance. The defendant moved to dismiss, on the ground that the ordinance was invalid, which motion was denied. The city of Chicago contended that the city council was authorized to pass the ordinance by section 95 of article 5 of the Cities and Villages act. This court, after consideration of certain cases cited in the opinion, said: "By the provisions of section 95 of the statute before cited, second-hand and junk stores are classed together in a manner indicating that the General Assembly had in mind only second-hand stores carrying on a business similar to that carried on by junk stores, where inducements are liable to be held out to minors to steal articles in order to sell them at such stores. The cases above referred to support this conclusion, and they also support the conclu-

sion which we have reached that the evidence in this case does not show that the store conducted by defendant was within the class of stores which city councils are given the power to tax, license and regulate by that section of the statute. The only second-hand articles that defendant dealt in, so far as the evidence shows, were books and magazines. There is no evidence that his store was in the nature of a junk store." It was held that the ordinance under which the defendant was convicted was invalid, so far as it applied to the facts in that case.

In *City of Chicago* v. *Northern Paper Stock Co. supra,* the defendant conducted a business in which it bought sorted rags and papers in bales by loads from dealers in those commodities, opened the bales, removed foreign substances, further sorted the rags and papers according to quality and made them into new bales, which it sold to mills in quantities of not less than five hundred pounds. The city of Chicago charged that the defendant conducted a junk store and operated the business of a junk dealer without a license, in violation of a municipal ordinance enacted under section 95 of article 5 of the Cities and Villages act. At page 198 the court said: "Sub-section 95 of section 1 of article 5 of the Cities and Villages act designates junk stores and yards as the subjects, which, under the grant of powers, may be municipally regulated. The business of dealing in junk is a recognized commercial enterprise. In conferring upon cities and villages the power to tax, license and regulate junk stores, the General Assembly doubtless contemplated that the power would be exercised with respect to places of business commonly known and understood as such. The added power enabling a city or village to forbid a junk store buying or receiving any article from a minor without the written consent of his parent or guardian enforces this conclusion. A minor who has committed larceny can more readily dispose of the stolen article at a junk or second-hand store than at most

other stores or shops." This court held that the business of the defendant did not come within the grant of power to the city under section 95 of article 5 of the Cities and Villages act.

It is contended, however, on behalf of the defendants, that, by amendment, section 95 of article 5 of the Cities and Villages act is now an express grant of power to tax and regulate the businesses of the various plaintiffs herein. It is the contention of the defendants that the section, as amended, grants the power to municipalities to regulate not merely junk dealers and second-hand dealers whose business is in the nature of junk business, but also grants the power to regulate all dealers in any second-hand article whatsoever.

The defendants contend that the statute in question is plain in meaning and unambiguous so that no rule of construction need be applied to it. In support of this contention they cite *Sup* v. *Cervenka,* 331 Ill. 459. This court, in that case, held that the intention of the legislature must primarily be determined from the language of the statute itself and not from conjectures *aliunde;* that when the language is plain and unambiguous and conveys a clear and definite meaning, there is neither necessity nor authority for resorting to statutory construction, and that the sole function of the courts is to determine, and within the constitutional limits of the legislative power to give effect to, the intention of the legislature.

Section 95 of article 5 of the Cities and Villages act does not appear, however, so plain in meaning and unambiguous that the intent of the legislature can be determined without resorting to rules of construction with which the legislature itself is presumed to be familiar. It is also to be observed that in the *Sup case* the court had under consideration a pension act which this court said should be liberally construed to effect the object sought to be accomplished; the statute under consideration in this case is a

grant of power to a municipal corporation which this court has held to be subject to strict construction. In *City of Chicago* v. *Moore, supra,* we said: "The existence and powers of a municipal corporation are derived by it from the General Assembly. It has no inherent power. Legislation by a municipal corporation is valid only when it is authorized by statute, and statutes granting powers to a municipal corporation are construed strictly against such corporation. Any fair or reasonable doubt of the existence of an asserted power is resolved against the municipality which claims the right to exercise it. * * * Since a city has no power, except by delegation from the General Assembly, to license any occupation or to require the payment of a tax for the privilege of engaging in it, the power, if it exists, must be expressly granted or necessarily implied or incident to the power expressly granted."

This court held likewise in *City of Chicago* v. *Ross,* 257 Ill. 76, that legislative powers of municipal corporations must be strictly construed. That case involved the construction of clause 45 of paragraph 62 of the Cities and Villages act and presented a question very similar to that under consideration in this case. The statute under construction in the *Ross case* authorized the passage of an ordinance to suppress "all fraudulent devices and practices for the purpose of gaming or of obtaining money or property." This language, standing alone, this court said, would, perhaps, be ample to authorize the passage of an ordinance against the obtaining of money or property by fraudulent devices and practices in the name of or by means of spirit mediumship, palmistry, card reading, astrology, seership or like crafty science or fortune-telling of any kind, but since it was preceded, in the same clause, by a grant of power expressed in specific language and authorizing the passage of an ordinance suppressing gaming and gambling houses and lotteries, it was held that the general words must be

construed to include only things of the same kind as those indicated by the particular and specific words. We further said: "It is, we think, quite clear that the general language which provides for the suppression of 'all fraudulent devices and practices,' and which immediately follows the specific language found in the statute, must be held to refer to devices and schemes which involve an element of chance and which are similar to the things designated by the particular words found in the statute—that is, gaming, gambling houses and lotteries—and not to the practices prohibited by section 1988 of the municipal code of Chicago. It has been repeatedly held by this and other courts, that where general words follow particular and specific words in a statute the general words must be construed to include only things of the same kind as those indicated by the particular and specific words; (*Shirk* v. *People,* 121 Ill. 61; *Ambler* v. *Whipple,* 139 id. 311; *Cecil* v. *Green,* 161 id. 265; *Gundling* v. *City of Chicago,* 176 id. 340;) and this rule is enforced in the construction of a statute unless there is something in the statute, or its context, which shows that the doctrine of *ejusdem generis* should not be applied.—*In the matter of Swigert,* 119 Ill. 83; *Webber* v. *City of Chicago,* 148 id. 313; *City of Chicago* v. *M. & M. Hotel Co.* 248 id. 264; *Wiggins* v. *State,* 87 N. E. Rep. 718."

It is apparent from a reading of the statute under consideration that the general words "any second-hand article whatsoever" follow particular and specific words "junk, rags," and under the doctrine of *ejusdem generis* they must be construed to include only things of the same kind as those indicated by the preceding particular and specific words.

This doctrine was also followed in *City of Clinton* v. *Wilson,* 257 Ill 580, in which we held that an ordinance prohibiting keeping open on Sunday "any billiard room, ball or pin alley, baseball grounds or other places of amusement" did not include moving picture shows, on the ground

that, although a moving picture show was a place of amusement, the amusements specifically enumerated were of the character of games or sports and the general words following an eumeration of particular things applied only to things of the same kind as those specifically referred to.

In *City of Chicago* v. *Moore, supra,* we called attention to the fact that by the provisions of section 95, prior to amendment, second-hand and junk stores were classed together in a manner indicating that the General Assembly had in mind only second-hand stores carrying on a business similar to that carried on by junk stores, where inducements are liable to be held out to minors to steal articles in order to sell them at such stores. The question whether a certain business comes within the municipal power to "tax, license and regulate," granted by statute, must be determined by the general character and scope of the business. (*City of Chicago* v. *Northern Paper Stock Co. supra,* and cases there cited.) The statute, as amended, also classes together dealers in junk, rags and second-hand articles and retains the provision in regard to purchases from minors, indicating that the General Assembly had in mind the regulation only of second-hand stores carrying on a business similar to junk stores, dealers in junk, rags and similar articles. Articles or materials collected by junk dealers and sold in junk stores may, by their subsequent treatment in an independent business or occupation, become of enhanced commercial value and have ultimate use in another form. Such a business can hardly be designated as a junk store or yard. (*City of Chicago* v. *Northern Paper Stock Co. supra.*) The general words "any second-hand article whatsoever" do not add another classification to several diversified groups but add a general limitation similar to the preceding specific classes. For that reason the case of *McReynolds* v. *People,* 230 Ill. 623, does not apply. Nor is the case of *Webber* v. *City of Chicago,* 148 Ill. 313, in point, because in that case the ordinance spe-

cifically used the words "not here enumerated," in connection with the last and general words. The case of *Gage* v. *Cameron*, 212 Ill. 146, is not concerned with the construction of a statute which is to be strictly construed.

There is a further restriction where general words will not include any of the classes superior to that to which the particular words belong. (*Ambler* v. *Whipple*, 139 Ill. 311.) In that case we held that a judgment, being of a superior grade to bonds, promissory notes, bills of exchange, written leases and written contracts, was not embraced by the general words, "or other evidence of indebtedness in writing." It is apparent that "any second-hand article whatsoever," under this rule, would not be applicable to articles of a superior grade or more valuable than those described by the particular words "junk, rags."

In the most literal sense it would be a misuse of terms to call a place of business a second-hand store where the dealing in second-hand material is merely an incident of the business, not an essential part of it nor its principal purpose. We have heretofore refused to extend a junk or second-hand dealer ordinance to individuals who buy in large quantities, who perform a substantial service upon such items or who purchase them only as an incident to their principal business. In *City of Chicago* v. *Northern Paper Stock Co. supra,* we said: "A city may not extend its power by a mere definition. (*Emmons* v. *City of Lewistown*, 132 Ill. 380.) Without a statutory grant of power, the commonly accepted meaning of a junk store cannot be extended by ordinance to include the business of buying rags and paper from dealers in large quantities, sorting and grading them according to quality, and selling them to mills and factories, usually in car-load lots. In such a business the materials are not collected, held or sold in the manner practiced by one operating a junk store or yard. A business does not come within the terms of a regulatory measure when the reason for the regulation does not exist."

Other substantial objections to the ordinance have been argued but what we have said disposes of the case and it will not be necessary to consider them.

The ordinance which sought to regulate the businesses of the plaintiffs herein is invalid as to them and the several decrees entered by the trial court will be affirmed.

*Decrees affirmed.*

ORR and WILSON, JJ., dissenting.